BARBARA C. LATTA AND NORMA B. ELLIS, PLAINTIFFS V.
JAMES L. "RIP" RAINEY, JR., DEFENDANT

No. COA09-511

(Filed 2 March 2010)

## 1. Appeal and Error— preservation of issues—claim preclusion

Defendant did not preserve for appeal his argument that plaintiffs presented insufficient evidence that mobile billboard sales/lease-back investments sold by defendant were "securities" as defined by N.C.G.S. §§ 78A-1 to -66. Moreover, a federal district court's prior holding that the investments at issue were securities precluded defendant from relitigating the issue in the present case.

## 2. Securities— exempt from registration—offeror—number of investors

The trial court did not err in denying defendant's motions for summary judgment and JNOV and the issue of whether mobile billboard sales/lease-back investments sold by defendant were exempt from registration under N.C.G.S. § 78A-17(9) was properly submitted to the jury. Mobile Billboards of America, not defendant, was the "offeror" of the securities and there was a triable issue of fact concerning the number of individuals who had invested in the securities.

## 3. Statutes of Limitation and Repose— securities—claims not time-barred

The trial court did not err in denying defendant's motions for summary judgment and JNOV because even if the issue of whether defendant was liable for selling unregistered securities was barred by a two-year statute of limitations, the issues pertaining to plaintiffs' security claims under N.C.G.S. §§ 78A-8 and -56 were subject to a three-year statute of limitations, which had not expired before the complaint was filed.

## 4. Fraud— billboard sales and lease—sufficient evidence

The trial court did not err in denying defendant's motions for directed verdict and JNOV on plaintiffs' claims for actual fraud and securities fraud as there was sufficient evidence to support each element of both claims. Defendant abandoned his assignment of error challenging the jury's finding him liable for constructive fraud.

**5. Evidence— relevance—exclusion proper or nonprejudicial**

Defendant's argument that the trial court erred in excluding certain evidence was overruled. Some of the challenged evidence was either correctly excluded as irrelevant or, even if erroneously excluded, was nonprejudicial. Furthermore, defendant failed to make an offer of proof with respect to the remaining challenged evidence so the exclusion of this evidence was not reviewed on appeal.

Appeal by defendant from judgments entered 17 December 2008 by Judge William C. Griffin, Jr. in Wilson County Superior Court. Heard in the Court of Appeals 4 November 2009.

*Martin & Jones, PLLC, by Walter McBrayer Wood, for plaintiffs-appellees.*

*McDaniel & Anderson, L.L.P., by L. Bruce McDaniel, for defendant-appellant.*

HUNTER, Robert C., Judge.

Defendant James L. "Rip" Rainey, Jr. appeals from judgments entered after the jury found him liable to plaintiffs Barbara C. Latta and Norma B. Ellis for compensatory and punitive damages resulting from his participation in a Ponzi scheme involving investments in mobile billboard advertising. In challenging the compensatory damage verdicts only, defendant argues that the trial court erred in denying his motions for a directed verdict and judgment notwithstanding the verdict ("JNOV"). As the evidence presented at trial tended to establish each element of plaintiffs' claims, the trial court properly denied the motions and submitted the claims to the jury. Accordingly, we find no error.

Facts

Beginning in the spring of 2001 and continuing into August 2004, Mobile Billboards of America, Inc. ("MBA") sold mobile billboard investments throughout the United States, including North Carolina. As part of the sales process, MBA's sales agents presented potential investors with an "offering circular," a disclosure document designed to comply with federal and state regulations regarding "business opportunities."

Under the investment scheme, investors would purchase a billboard "unit" for $20,000.00 and simultaneously lease the unit for a

seven year term to Outdoor Media Industries ("OMI"), a shell company affiliated with MBA and owned and operated by MBA's principals. Investors were told that OMI would arrange for placement of the billboards on trucks for display, obtain advertising for each billboard, and make monthly lease payments to investors. Investors were told that the lease payments would provide a return of roughly 13.49% per year. At the end of the seven year term, MBA would buy back the billboard units for the full purchase price.

In order to fund the repurchasing of the billboards, MBA told investors that it had established the Reserve Guaranty Trust ("RGT") to insure that funds would be available and that $5,000.00 of the initial purchase price would be deposited into the RGT to support the buy-back. The funds in the RGT were to be invested to generate profits to fund the buy-back. In return for the initial $5,000.00 payment into RGT, RGT issued investors a Trust Secured Certificate that entitled them to an undivided beneficial interest in RGT's assets with a liquidation amount of up to the full amount invested by each individual investor—i.e., $20,000.00 times the number of billboard units purchased.

From May 2003 through April 2004, defendant, a Certified Senior Advisor, was a sales agent of MBA in North Carolina. Sometime in 2003, defendant began meeting with Mrs. Ellis, Mrs. Latta, and her husband Charles W. Latta to discuss investment opportunities. Mrs. Ellis and the Lattas explained to defendant that because they were retirees living on fixed incomes, their primary investment objective was the protection of principal, particularly for Mrs. Latta, whose husband was terminally ill. According to plaintiffs, defendant recommended investing in MBA billboards, stating, among other things, that MBA was a "well settled" and "safe company" and that he "saw no problems with them"; that plaintiffs "could not lose any of [their] principal"; that the investments were "good" and had "absolutely no risk"; that the risk in investing in MBA "is so minimal it is not even worth mentioning"; and that defendant's father had invested in MBA and was planning to invest more.

On 21 November 2003, Mrs. Ellis purchased two MBA units from defendant for a total investment of $40,000.00. The Lattas purchased two units on 4 February 2004, one unit on 7 April 2004, and two more units on 21 April 2004, for a total investment of $100,000.00. According to plaintiffs, they were never given any of the MBA investment documentation to read; defendant explained everything to

them, filled out their paperwork in his own handwriting, and told them what they were signing.

The amount of sales agent commissions was not provided in MBA's investment materials and it was defendant's policy not to disclose the amount of his commissions unless asked directly. Defendant did not tell plaintiffs that he was receiving a 16-20% commission on their investments.

Plaintiffs received payments from OMI for the first year of their investment and for some time afterward. The payments were labeled "lease payments" and were supposed to come from OMI's advertising revenue. In actuality, however, MBA transferred money invested by more recent investors to OMI to fund the "lease payments" to earlier investors. Although defendant was aware that MBA was "taking part of the client's own money and giving it back to them" in the form of purported "lease payments," defendant did not disclose this fact to any of his clients, including plaintiffs because, as MBA management explained to him, if investors knew that they were being paid with their own money, they "would not have invested in it . . . ."

In order to "present[]" the sales investments as "business opportunities" rather than "securities," MBA provided in a memo to its sales agents a list of "unacceptable terms" that should "never" be used in discussing the investment with a client: "investment," "investor," "invest," "guaranty," "guarantee," "guaranteed," "interest," "annuity," "securities," insurance," "insure," and "sales/leaseback program."

By 31 March 2004, defendant and his business partner Arthur J. Anderson, Jr. were aware that the Secretary of State's Office was investigating MBA, believing that the investments were securities subject to federal and state regulation rather than business opportunities. The Secretary of State issued a cease and desist order to MBA on 7 April 2004, and defendant was aware that MBA had been shut down in North Carolina when he received Mrs. Latta's final investment payment on 21 April 2004. Defendant did not tell Mrs. Latta that MBA had been shut down.

On 15 September 2004, the Secretary of State sent a temporary cease and desist order to MBA sales agents in North Carolina, including defendant and Mr. Anderson, barring them from soliciting, offering, or selling MBA contracts to purchase until the contracts were registered as a security with the State and they registered as securities dealers or salespersons. On 17 September 2004, defendant was served with process in an administrative action against MBA. Three

days later, defendant sent a letter to his clients, including plaintiffs, advising them that the State had issued a cease and desist order to MBA and had initiated an action against MBA. The letter did not disclose that defendant had also been issued a cease and desist order or that he was named as a defendant in the action. In his letter to his clients, defendant stated that he had retained legal counsel to protect their "best interests" and that he planned on filing a lawsuit against MBA. Defendant urged his clients to quickly join the potential lawsuit as their delay might result in not being able to participate.

On 1 November 2004, the attorneys retained by defendant filed a complaint against MBA's principals in United States District Court for the Middle District of North Carolina (the "*Allison* case"). Throughout the litigation, defendant told his clients, including plaintiffs, that he was trying to maximize the return on their investments; that hopefully any return from the litigation would be in addition to any award from MBA's receiver in the administrative action; that he would pay their legal fees associated with the litigation; that no fines had been levied against his office and that this should reinforce the investors trust in him; that it was his duty to "seek what was in [their] best interests"; and that his clients should get a substantial settlement as he "started early" and was "first in line."

The Secretary of State obtained an entry of default against defendant on 3 August 2005 and a final cease and desist order was issued to defendant on 19 August 2005. The *Allison* case was dismissed on 30 August 2005 for lack of personal jurisdiction over the defendants and the decision was not appealed.[1] After the *Allison* case was dismissed, plaintiffs filed suit against defendant, as well as his wife Elisabeth G. Rainey, Daniel S. Dark, Mr. Anderson, Gary P. Walker, and 50 "[John] Does." Plaintiffs asserted claims for (1) sale of unregistered securities; (2) sale of securities by unregistered salespeople or dealers; (3) securities fraud; (4) negligence *per se*; (5) negligence and gross negligence; (6) negligent misrepresentation; (7) breach of fiduciary duty; (8) common law fraud; (9) fraudulent concealment; (10) conversion; and (11) equitable estoppel in asserting a statute of limitations defense. Plaintiffs requested compensatory damages, punitive and treble damages, and attorney's fees. Defendants filed an answer generally denying plaintiffs' claims, moving to dismiss plaintiffs' claims, and asserting affirmative defenses, including estoppel, laches, and statute of limitations. Defendant filed for bankruptcy on 1 March 2007; in an order issued 31 May 2007, the

---

1. *See Allison v. Lomas*, 387 F. Supp. 2d 516 (M.D.N.C. 2005).

bankruptcy court allowed plaintiffs to proceed with their state law claims against defendant. Mr. Latta died on 11 October 2007.

Prior to trial, plaintiffs moved for partial summary judgment, asserting that defendants should be collaterally estopped from litigating the issue of whether the MBA investments were securities subject to federal and state regulation because the issue had already been litigated in a federal district court case involving defendants.[2] The trial court granted plaintiffs' motion on 1 December 2008. Plaintiffs subsequently took a voluntary dismissal of all their claims against all defendants except Mr. Rainey.

Trial began on 1 December 2008. Defendant moved for directed verdict at the close of plaintiffs' evidence and the trial court directed verdicts in favor of defendant on plaintiffs' claims for the sale of securities by an unregistered salesperson or dealer, breach of fiduciary duty, fraudulent concealment, conversion, and equitable estoppel. The trial court submitted the remaining claims to the jury, and, with respect to Mrs. Latta, the jury found defendant liable for selling unregistered securities, common law fraud, securities fraud, and punitive damages. Mrs. Latta was awarded $95,503.40 in compensatory damages, $750,000.00 in punitive damages, $87,500.00 in attorney's fees, and $10,866.60 in costs. As for Mrs. Ellis, the jury found defendant liable for selling unregistered securities, constructive fraud, and securities fraud, as well as punitive damages. The jury awarded Mrs. Ellis $35,953.06 in compensatory damages, $500,000.00 in punitive damages, $87,500.00 in attorney's fees, and $10,866.60 in costs. After trial, defendant moved for JNOV and for a new trial; the trial court denied both motions. In judgments entered on 17 December 2008, the trial court reduced Mrs. Latta's punitive damages to $286,510.20 and reduced Mrs. Ellis's punitive damages award to $107,859.18. Defendant timely appealed the judgments to this Court.[3]

## Motions for Directed Verdict and JNOV

Defendant first contends that the trial court erred in denying his motions for directed verdict and JNOV. The standard of review of the denial of a motion for a directed verdict and of the denial of a motion for JNOV are identical. *Martishius v. Carolco Studios, Inc.*, 355 N.C. 465, 473, 562 S.E.2d 887, 892 (2002). Both motions require the deter-

2. *See Hays v. Adams*, 512 F. Supp. 2d 1330 (N.D. Ga. 2007).

3. By order of this Court entered 13 October 2009, plaintiffs took leave to move the trial court to amend the judgment for Mrs. Ellis to correctly calculate the amount of punitive damages award in accordance with N.C. Gen. Stat. § 1D-25(b) (2009).

mination of "whether the evidence presented at trial is legally suffi-
cient to take the case to the jury." *Taylor v. Walker*, 320 N.C. 729, 733,
360 S.E.2d 796, 799 (1987). In ruling on either motion, the trial court
must consider all the evidence presented at trial in the light most
favorable to the non-moving party, with the non-moving party being
given the benefit of every reasonable inference that legitimately may
be drawn from the evidence and all conflicts in the evidence being
resolved in the non-moving party's favor. *Smith v. Price*, 315 N.C. 523,
527, 340 S.E.2d 408, 411 (1986). "If, after undertaking such an analy-
sis of the evidence, the trial [court] finds that there is evidence to sup-
port each element of the nonmoving party's cause of action, then the
motion for directed verdict and any subsequent motion for judgment
notwithstanding the verdict should be denied." *Abels v. Renfro Corp.*,
335 N.C. 209, 215, 436 S.E.2d 822, 825 (1993). Thus, motions for a
directed verdict or JNOV are properly granted only when "it appears,
as a matter of law, that a recovery cannot be had by the plaintiff upon
any view of the facts which the evidence reasonably tends to estab-
lish." *Manganello v. Permastone, Inc.*, 291 N.C. 666, 670, 231 S.E.2d
678, 680 (1977).

### I. Applicability of the North Carolina Securities Act

[1] Defendant first argues that plaintiffs failed to present any evi-
dence at trial establishing that the MBA billboard sales/lease-
back investments are "securities" as defined by the North Carolina
Securities Act, N.C. Gen. Stat. §§ 78A-1 to -66 (2009) ("NCSA").
Thus, defendant contends, he cannot be held liable for securi-
ties fraud under N.C. Gen. Stat. § 78A-8(2) (2009) and N.C. Gen. Stat.
§ 78A-56(a)(2) (2009).

Prior to trial, plaintiffs moved for partial summary judgment,
asserting that the federal district court's holding in *Hays*, 512 F. Supp.
2d at 1339, that the MBA investments are securities, precluded de-
fendant from re-litigating the issue in this case. The trial court
granted plaintiff's motion for summary judgment. Defendant failed to
assign error to the court's entering summary judgment in favor of
plaintiffs on this issue, and, therefore, has waived appellate review of
his contention that the investments are not securities under the
NCSA. N.C. R. App. P. 10(a).[4]

---

4. On 2 July 2009, the North Carolina Supreme Court adopted new rules of appel-
late procedure. The newly adopted Rule 10 replaces assignments of error with
"[p]roposed issues on appeal." N.C. R. App. P. 10(b). The new rules govern those
appeals filed on or after 1 October 2009. Because defendant noticed his appeal prior to
the effective date of the new rules, they are inapplicable.

In any event, the doctrine of collateral estoppel or claim preclusion bars defendant from re-litigating whether the MBA investments are, in fact, securities. *See Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 15, 591 S.E.2d 870, 880 (2004) ("[T]he determination of an issue in a prior judicial or administrative proceeding precludes the relitigation of that issue in a later action, provided the party against whom the estoppel is asserted enjoyed a full and fair opportunity to litigate that issue in the earlier proceeding."). In *Hays*, 512 F. Supp. 2d at 1336-40, defendant—a named defendant in that action—made precisely the same argument he makes here. The district court explicitly held that the investments are, in fact, securities and noted that defendant's argument to the contrary was "disingenuous, at best." *Id.* at 1339-40. Defendant's contention is, therefore, overruled.

## II. Exemption from Registration under the NCSA

[2] Defendant next argues that even if the investments are "securities" for purposes of the NCSA, the investments are exempt from registration requirements and "so there could be no violation for sale of an unregistered security that did not have to be registered in the first place." Specifically, defendant asserts that the MBA investments are exempt from registration under N.C. Gen. Stat. § 78A-17(9) (2009), which excludes "[a]ny transaction pursuant to an offer directed by the offeror to not more than 25 persons . . . in this State during any period of 12 consecutive months . . . ."[5] N.C. Gen. Stat. § 78A-18(b) (2009) establishes that "[i]n a civil or administrative proceeding brought under this Chapter, the burden of proving an exemption . . . is upon the person claiming it."

Defendant contends that the registration exemption in § 78A-17(9) applies to the MBA investments because *defendant* sold the MBA investments to only "11 or 12" people in North Carolina. Defendant's argument is predicated on the supposition that he is the "offeror" referenced in § 78A-17(9), not MBA. The NCSA does not define the term "offeror." Defendant fails to cite any authority—and we have found none—supporting his position.

As defendant's counsel acknowledged in oral arguments, defendant's interpretation of § 78A-17(9) would lead to the untoward result that an entity such as MBA could sell an unlimited number of securi-

---

5. Defendant also cites the exemption provided in N.C. Gen. Stat. § 78A-17(17), but makes no specific argument in his brief that the MBA investments fall within this exemption. This contention is thus deemed abandoned on appeal. N.C. R. App. P. 28(b)(6).

ties through its sales agents so long as it had enough agents that no agent made an offer of investment to more than 25 potential investors. *See Hobbs v. Moore County*, 267 N.C. 665, 671, 149 S.E.2d 1, 5 (1966) ("If possible, the language of a statute will be interpreted so as to avoid an absurd consequence."). This reading of § 78A-17(9) would undermine one of the primary purposes of securities regulations: "protect[ing] the investing public from inequities in trading . . . ." *Skinner v. E. F. Hutton & Co.*, 70 N.C. App. 517, 520, 320 S.E.2d 424, 427 (1984) (citing *S.E.C. v. Texas Gulf Sulfur Co.*, 401 F.2d 833 (2d Cir. 1968), *cert. denied*, 394 U.S. 976, 22 L. Ed. 2d 756 (1969)), *aff'd in part and rev'd in part on other grounds*, 314 N.C. 267, 333 S.E.2d 236 (1985).[6] We conclude, therefore, that MBA, through its sales agents, like defendant, is the actual "offeror" of the securities at issue in this case.

Defendant testified that he "arranged" for the complaint to be filed in the *Allison* case. The *Allison* complaint was admitted into evidence at trial and indicates that defendant's clients—including Mrs. Latta and Mrs. Ellis—sued other entities involved in the MBA investment scheme, alleging that it was a Ponzi scheme in violation of federal securities law and Chapter 75 of the North Carolina General Statutes. The *Allison* complaint states that MBA had at least 200 clients in North Carolina. The complaint further alleges: "The Mobile Billboard investments that were sold to investors, including the Plaintiffs, are securities, but no registration statement has been filed in connection with any of these investments and *no exemption is available*." (Emphasis added.) Defendant testified at trial that he believed the allegations in the *Allison* complaint to be true.

Thus, defendant's testimony at trial raised a triable issue of fact concerning the number of investors in North Carolina. The trial court, therefore, properly submitted the issue to the jury to determine whether he met his burden of proof under N.C. Gen. Stat. § 78A-18(b).

### III. Statute of Limitations

[3] Defendant next argues that the trial court should have granted his motions for directed verdict and JNOV because plaintiffs' NCSA claims are barred by the Act's statute of limitations. N.C. Gen. Stat. § 78A-56(f) provides that claims for selling unregistered securities in

---

6. Although not controlling our interpretation of the NCSA, this Court has found it "instructive" to consider cases construing federal securities statutes and regulations. *State v. Davidson*, 131 N.C. App. 276, 282, 506 S.E.2d 743, 748 (1998), *disc. review denied*, 350 N.C. 312, 535 S.E.2d 34 (1999).

violation of N.C. Gen. Stat. § 78A-24 (2009) or being an unregistered securities dealer in violation of N.C. Gen. Stat. § 78A-36 (2009) must be filed within "two years [from] the sale or contract of sale." For "any other violation" of the Act, the statute provides that a person must file within

> three years [from the date] the person discovers facts constituting the violation, but in any case no later than five years after the sale or contract of sale, except that if a person who may be liable under this section engages in any fraudulent or deceitful act that conceals the violation or induces the person to forgo or postpone commencing an action based upon the violation, the suit may be commenced not later than three years after the person discovers or should have discovered that the act was fraudulent or deceitful.

N.C. Gen. Stat. § 78A-56(f).

Mrs. Ellis purchased MBA billboard units on 21 November 2003. The Lattas made purchases on 4 February 2004, 7 April 2004, and again on 21 April 2004. Their complaint was filed on 22 February 2006—over two years from the first two purchases but within two years of the April purchases.

Defendant maintains that plaintiffs' claims are "merely for the sale of unregistered securities" in an attempt to squeeze their claims into the two-year limitations period established for violations of N.C. Gen. Stat. § 78A-24. Defendant's characterization of plaintiffs' claims ignores the fact that plaintiffs not only asserted claims under § 78A-24 and § 78A-36,[7] but also brought a claim for securities fraud under § 78A-8 and § 78A-56, which are subject to the three-year limitations period. N.C. Gen. Stat. § 78A-56(f).

The trial court submitted the following issues to the jury:

1. Did the defendant sell a security and in doing so make any untrue statement of a material fact?

. . . .

2. Did the defendant sell a security and in doing so omit to state a material fact necessary in order to make the statements made,

---

[7]. At the close of plaintiffs' evidence, the trial court granted a directed verdict in favor of defendant on plaintiffs' claim that defendant was an unregistered securities dealer under N.C. Gen. Stat. § 78A-36.

in the light of the circumstances under which they were made, not misleading?

. . . .

3. Did the defendant sell a security and in doing so engage in any act, practice, or course of business which operated as a fraud or deceit upon a person?

. . . .

4. Did the defendant sell a security in North Carolina that had not been registered?

. . . .

The jury answered "[y]es" to all four questions.

The first three issues pertain to plaintiffs' securities fraud claims under § 78A-8 and § 78A-56. The fourth issue relates to selling unregistered securities in violation of § 78A-24. The verdict sheet indicates that all four issues were submitted in the alternative. Thus, even assuming, without deciding, that the trial court erred in submitting to the jury the issue of whether defendant is liable for selling unregistered securities on the ground that plaintiffs' claim is barred by the statute of limitations, the jury's finding that defendant violated § 78A-8 and § 78A-56, which are subject to the three year statute of limitations, support its verdict.

### IV. Fraud Claims

[4] In his next argument, defendant contends that the trial court erred in denying his motions for directed verdict and JNOV on plaintiffs' fraud claims. The jury found defendant liable to Mrs. Latta for common law or actual fraud and securities fraud; it found defendant liable to Mrs. Ellis for constructive fraud and securities fraud.

Although defendant assigned error to the jury's finding him liable to Mrs. Ellis for constructive fraud, defendant fails to make any specific argument in his brief challenging that verdict. Defendant's assignment of error regarding Mrs. Ellis's constructive fraud claim is, therefore, "taken as abandoned." N.C. R. App. P. 28(b)(6). With respect to the actual fraud and securities fraud claims, defendant fails to differentiate between the two types of claims, lumping them together into one argument.

The essential elements of actual fraud are: "(1) False representation or concealment of a material fact, (2) reasonably calculated to

deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974).

In contrast to the elements of actual fraud

N.C.G.S. § 78A-8(2) and N.C.G.S. § 78A-56(a)(2) . . . impose[] civil liability upon any person who: "Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of the untruth or omission . . . ."

*Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 41, 626 S.E.2d 315, 322 (quoting N.C. Gen. Stat. § 78A-56 (a)(2)), *disc. review denied*, 360 N.C. 531, 633 S.E.2d 674 (2006); N.C. Gen. Stat. §§ 78A-8(2) and -56(a)(2). *See also Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 34, 581 S.E.2d 452, 463 (setting out elements of securities fraud by purchaser), *disc. review denied*, 357 N.C. 511, 588 S.E.2d 473 (2003).

### A. False Representation or Omission of Material Fact

Defendant claims that the only "arguable misrepresentation" is that he told plaintiffs that there was "very little risk" involved in the MBA investments and that the only "material omission" attributable to defendant is his failure to disclose to plaintiffs the amount of his sales commission. Defendant thus concedes that he made at least one false representation and omission.

In addition, however, plaintiffs point to the fact that defendant was aware that the "lease payments" OMI made to investors like plaintiffs was not revenue from selling advertising but were actually funds transferred from MBA from more recent investments. At trial, defendant explained that he did not tell his clients, including plaintiffs, about the source of the purported lease payments because, as he was advised by MBA management, if he had told his clients, "people would not have invested in it . . . ." From his testimony, the jury could reasonably conclude that defendant misrepresented or failed to disclose to plaintiffs the actual source of the purported lease payments.

Evidence at trial also indicated that defendant learned that the State was investigating MBA as early as 31 March 2004 and that he had received notice of the cease and desist order soon after it was issued on 7 April 2004. Mrs. Latta produced at trial a copy of a check to MBA dated 21 April 2004. She testified that she gave the check, totaling $40,000.00, to defendant on 21 April 2004 as her final purchase of MBA units. Mrs. Latta explained that defendant did not tell her that the Secretary of State was shutting down MBA in North Carolina when he received her payment on 21 April 2004. Defendant received his commission from Mrs. Latta's 21 April 2004 investment. From this evidence, the jury could reasonably infer that although defendant knew that MBA was under investigation he did not disclose this information to Mrs. Latta on 21 April 2004 when he accepted her final investment.

Defendant next argues that any misrepresentation or omission on his part was immaterial. A misrepresentation or omission is "material" if, had it been known to the party, it would have influenced the party's judgment or decision to act. *Godfrey v. Res-Care, Inc.*, 165 N.C. App. 68, 75-76, 598 S.E.2d 396, 402, *disc. review denied*, 359 N.C. 67, 604 S.E.2d 310 (2004). Materiality is generally a question of fact for the jury. *Tharrington v. Sturdivant Life Ins. Co.*, 115 N.C. App. 123, 127, 443 S.E.2d 797, 800 (1994).

As for his admitted misrepresentation regarding the "low risk" involved in the MBA investments, plaintiffs' testified that when they first met with defendant to discuss investment options, they told defendant that their primary objective, as retirees on fixed incomes, was the preservation of principal. From this evidence, the jury reasonably could have inferred that defendant's misrepresentations about the "low risk" involved in the MBA investments induced their investment and was thus material. *See Mach. Co. v. Bullock*, 161 N.C. 1, 6, 76 S.E. 634, 636 (1912) ("Fraud is material to a contract when the [contract] would not have been made if the fraud had not been committed." (citation and quotation marks omitted)).

Similarly, with respect to defendant's omission regarding the size of his commissions, plaintiffs testified that "it would have mattered a great deal" if they had known that defendant was receiving a 16-20% commission and that they would not have invested in MBA if that fact had been disclosed. As Mrs. Ellis explained on cross-examination, if she had known the size of defendant's commission, she would not have invested "[b]ecause if he was getting that much[,] naturally he was trying to sell it."

Defendant's own testimony from trial reveals the materiality of his omission regarding the "lease payments"—he believed people would not invest if they knew that they would be paid with money from subsequent investors. As Mrs. Latta testified at trial, if defendant had explained MBA's payment structure, it would have sounded "like a pyramid scheme." Similarly, Mrs. Latta testified that she would not have invested in MBA if she had known that the Secretary of State's Office was investigating the corporation. The jury could reasonably infer from this evidence that defendant's failure to disclose to plaintiffs the source of the purported lease payments and his failure to inform Mrs. Latta that the State was investigating MBA when he received her final investment were omissions of material fact. *See Shreve v. Combs*, 54 N.C. App. 18, 23, 282 S.E.2d 568, 572 (1981) (holding seller's failure to disclose to purchaser that land was "heavily encumbered" was "concealment of a material fact" where seller knew existence of encumbrances would affect purchaser's decision to buy).

### B. Intent to Deceive

Defendant also argues that there is no evidence that he acted with any intent to deceive plaintiffs. In the context of actual fraud, the required scienter is not present without both knowledge and an intent to deceive, manipulate, or defraud. *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988). Fraudulent intent "usually is not shown by direct evidence but generally is proven by circumstances[.] . . . Oftentimes the intent can be shown by presenting evidence of some motive on the part of the perpetrator." *McLamb v. McLamb*, 19 N.C. App. 605, 610, 199 S.E.2d 687, 690, *cert. denied*, 284 N.C. 424, 200 S.E.2d 660 (1973). Whether the defendant acts with the requisite scienter for fraud is generally a question of fact for the jury. *Pearce v. American Defender Life Ins. Co.*, 316 N.C. 461, 468, 343 S.E.2d 174, 178-79 (1986).

With respect to defendant's misrepresentations concerning the level of risk involved in the MBA investments, the evidence presented at trial tends to establish that defendant was aware of the high level of risk in investing in MBA and that plaintiffs would not invest in MBA if they knew that it was contrary to their personal financial goals of preserving principal. This evidence is sufficient to permit a reasonable inference that defendant intended to deceive plaintiffs. Similarly, with respect to his commissions, the jury could reasonably conclude that defendant intended to deceive plaintiffs about his 16-20% commissions by not disclosing that information unless asked directly.

As for the purported lease payments, again, defendant's own testimony belies his argument. From defendant's testimony, the jury could reasonably infer that defendant misrepresented the nature of the "lease payments" to plaintiffs because he believed that if they knew the actual source of the payments, they would not invest in MBA. Likewise, the jury could infer that defendant intended to deceive Mrs. Latta about MBA's status in order to receive his commission when he failed to tell her that the State was investigating MBA prior to accepting her final investment on 21 April 2004. *See Shreve*, 54 N.C. App. at 23, 282 S.E.2d at 572 (finding sufficient evidence of intent to deceive where seller told purchaser that title to land was clear despite knowledge of encumbrances that would hinder building permit process and seller knew purchaser intended to build on land and probably not purchase land if purchaser could not build on it).

### C. Reasonable Reliance

Defendant also claims that plaintiffs failed to establish the element of reasonable reliance. Defendant argues that plaintiffs should be estopped from bringing their fraud claims because plaintiffs admit that they received and reviewed the documentation disclosing the risk involved in the MBA investments.

This argument is premised on defendant's assertion that the only misrepresentation he made was the "low risk" assessment of the investment and that the only omission he made concerned the size of his commissions; it ignores the evidence that defendant was aware that OMI and MBA were paying earlier investors with investment funds from later investors. "Where material facts are accessible to the vendor only, and he knows them not to be within the reach of the diligent attention, observation and judgment of the purchaser, the vendor is bound to disclose such facts, and make them known to the purchaser." *Brooks v. Construction Co.*, 253 N.C. 214, 217, 116 S.E.2d 454, 457 (1960).

Nowhere in the extensive investment documentation presented at trial does it state that subsequent investors' money would be funding the purported lease payments to prior investors. As defendant testified at trial, he purposefully withheld information regarding the actual source of the "lease payments." We conclude that the jury could have reasonably found that plaintiffs reasonably relied upon defendant's omission regarding the source of the "lease payments."

## D. In Pari Delicto

Defendant also argues that the doctrine of *in pari delicto* bars Mrs. Ellis from bringing her fraud claims against defendant because she received a "referral fee" for referring Mrs. Latta to defendant. By accepting the referral fee, defendant claims that Mrs. Ellis is "comparably at fault by virtue of [her] aiding and abetting" defendant in the MBA investment scheme.

The legal doctrine of *in pari delicto*—meaning "equally at fault"—"prevents the courts from redistributing losses among wrong-doers." *Whiteheart v. Waller*, —— N.C. App. ——, ——, 681 S.E.2d 419, 422 (2009). Thus, where parties to a transaction are equally at fault, neither can recover from the other. *Trust Co. v. Gill*, 293 N.C. 164, 191, 237 S.E.2d 21, 37 (1977); *accord Byers v. Byers*, 223 N.C. 85, 90, 25 S.E.2d 466, 469-70 (1943) ("The law generally forbids redress to one for an injury done him by another, if he himself first be in the wrong about the same matter whereof he complains."). The defense, however, is "narrowly limited to situations in which the plaintiff was *equally* at fault with the defendant." *Skinner v. E. F. Hutton & Co.*, 314 N.C. 267, 272, 333 S.E.2d 236, 240 (1985).

Defendant testified at trial that Mrs. Ellis incurred a penalty for withdrawing from an investment unrelated to the MBA investments. Defendant agreed to repay the penalty but told Mrs. Ellis that "the only way [he] could . . . do[] it" was to "pay [her] a referral fee." From this testimony, the jury reasonably could have—and apparently did— reject defendant's *in pari delicto* defense, finding either that Mrs. Ellis did not engage in any culpable conduct with respect to a transaction involving defendant or that her culpability was not equal to that of defendant's.

In sum, plaintiffs evidence tended to establish a *prima facie* case for common law fraud and securities fraud. The trial court, therefore, properly submitted these claims to the jury. Defendant's arguments are overruled.

### V. Exclusion of Defendant's Evidence

[5] In his final argument addressing his motions for directed verdict and JNOV, defendant contends that it was reversible error for the trial court to exclude (1) evidence of plaintiffs' respective net worths; (2) transcripts from a criminal trial involving MBA's principal; (3) evidence of defendant's financial condition; and (4) testimony from defendant's other clients. Defendant argues that this

evidence was relevant to material issues at trial and thus should have been admitted.

Rule 401 of the Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. R. Evid. 401. Although a trial court's rulings on relevancy technically are not discretionary, and, therefore, are not reviewed under the abuse of discretion standard, they are given great deference on appeal. *State v. Lawrence*, 191 N.C. App. 422, 427, 663 S.E.2d 898, 901 (2008), *aff'd per curiam*, 363 N.C. 118, 678 S.E.2d 658 (2009).

Defendant first contends that he should have been allowed to present evidence of plaintiffs' individual net worths. Defendant argues on appeal, as he did at trial, that plaintiffs' net worths are relevant to whether the MBA investments were suitable for them given their financial status and goals.

Here, even if the specific information regarding each plaintiff's net worth is relevant, and thus the trial court erred in excluding the evidence under Rule 401, the exclusion of the evidence is not prejudicial. "The exclusion of evidence constitutes reversible error only if the appellant shows that a different result would have likely ensued had the error not occurred." *Forsyth Co. v. Shelton*, 74 N.C. App. 674, 678, 329 S.E.2d 730, 734, *appeal dismissed and disc. review denied*, 314 N.C. 328, 333 S.E.2d 484 (1985). "The burden is on the appellant not only to show error, but to show *prejudicial* error . . . ." *Responsible Citizens v. City of Asheville*, 308 N.C. 255, 271, 302 S.E.2d 204, 214 (1983).

Review of the transcript from trial shows that, although the trial court prevented defendant from presenting to the jury evidence of each plaintiff's net worth in specific monetary terms, defendant testified extensively that the MBA investments were suitable for plaintiffs *based on their net worths*. Given defendant's testimony that he took plaintiffs' net worths into consideration in determining whether to recommend investing in MBA, defendant fails to demonstrate any prejudice resulting from the exclusion of this evidence.

Defendant also argues that the trial court erred in excluding transcript excerpts from the criminal trial at which MBA's founder and principal, Michael Lomas, testified. Defendant contends that Lomas's testimony was relevant to plaintiffs' fraud claims because Lomas testified that its sales agents, such as defendant, who sold the MBA

investments to clients, were misled by MBA management. The record reveals, however, that defendant failed to make an offer of proof with respect to this evidence when the trial court sustained plaintiffs' objection to its admission. The exclusion of evidence will not be reviewed on appeal unless the record sufficiently shows what the evidence would have been. *State v. Golphin*, 352 N.C. 364, 462, 533 S.E.2d 168, 231 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). "[I]n order for a party to preserve for appellate review the exclusion of evidence, the significance of the excluded evidence must be made to appear in the record and a specific offer of proof is required unless the significance of the evidence is obvious from the record." *State v. Simpson*, 314 N.C. 359, 370, 334 S.E.2d 53, 60 (1985). Because the record on appeal fails to establish the "essential content or substance" of Lomas's testimony, this Court is unable to "ascertain whether prejudicial error occurred." *Id.* Defendant has, therefore, failed to preserve for review the trial court's exclusion of this evidence.

Defendant also claims that he should have been allowed to testify about his financial condition, including his net worth and the fact that he was in bankruptcy. Again, the record indicates that defendant failed to make an offer of proof when the trial court sustained plaintiffs' objection to the admission of defendant's testimony. Without " '[a] showing of the essential content or substance of the witness's testimony,' " it is "impossible on appellate review to determine whether exclusion of this testimony was prejudicial error." *State v. Satterfield*, 300 N.C. 621, 628, 268 S.E.2d 510, 515-16 (1980) (quoting *Currence v. Hardin*, 296 N.C. 95, 100, 249 S.E.2d 387, 390 (1978)).

The last piece of challenged evidence is the proffered testimony of other clients of defendant. Defendant argues that they should have been permitted to testify because they would have stated that defendant was "fair and honest with them in connection with their MBA investments." When the trial court sustained plaintiffs' objection to the witnesses testifying, defense counsel made the following offer of proof: "They would testify that they bought the same stuff [plaintiffs] did and that they weren't deceived and they understood it and they haven't sued Mr. Rainey or anything."

As described by trial counsel, we fail to perceive the relevance of the proffered testimony. Defendant's "good acts" or innocuous conduct with respect to his other MBA clients does not tend to make the

**LATTA v. RAINEY**

[202 N.C. App. 587 (2010)]

fact that defendant defrauded plaintiffs more or less probable given that plaintiffs only alleged and attempted to prove that defendant defrauded them in connection with *their* MBA investments. *See United States v. Santos*, 201 F.3d 953, 962 (7th Cir. 2000) (observing that evidence of "good acts" of a defendant is generally not probative unless it is alleged that "*every* transaction by [defendant] . . . was corrupt" (emphasis added)). The trial court, therefore, properly excluded the witnesses' testimony. *See State v. Hart*, 105 N.C. App. 542, 548, 414 S.E.2d 364, 368 (holding that "[e]vidence having no tendency to prove a fact at issue in the case is not relevant and is properly excluded" under Rules 401 and 402), *appeal dismissed and disc. review denied*, 332 N.C. 348, 421 S.E.2d 157 (1992).

## Motion for New Trial

Defendant also moved for a new trial under Rule 59 of the Rules of Civil Procedure. Defendant fails to make any specific argument regarding his motion for a new trial, simply combining it with his contentions concerning his motions for directed verdict and JNOV. Because defendant makes no separate and distinct argument regarding his motion for a new trial, we conclude that the trial court did not err in denying defendant's motion. *See Everhart v. O'Charley's, Inc.*, —— N.C. App. ——, ——, 683 S.E.2d 728, 742 (2009) ("O'Charley's' arguments [regarding its motions for a new trial] . . . repeat the contentions we found unpersuasive regarding its JNOV motion. As O'Charley's fails to make any separate and distinct arguments in support of its motion for a new trial, we hold that the trial court did not err in denying O'Charley's' motion for a new trial.").

## Punitive Damages

Defendant failed to assign error to the punitive damages awards and makes absolutely no argument in his brief for their reversal. The punitive damages awards, therefore, are not before this Court for review. N.C. R. App. P. 10(a); N.C. R. App. P. 28(b)(6).

No Error.

Judges CALABRIA and GEER concur.