NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship,
2013 NCBC 12

| STATE OF NORTH CAROLINA | | IN THE GENERAL COURT OF JUSTICE |
|---|---|---|
| | | SUPERIOR COURT DIVISION |
| COUNTY OF DURHAM | | 12 CVS 3945 |

| | | |
|---|---|---|
| NNN DURHAM OFFICE PORTFOLIO 1, LLC; et. al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **ORDER AND OPINION** |
| HIGHWOODS REALTY LIMITED PARTNERSHIP; et. al., | ) ) ) | |
| Defendants. | ) ) ) | |

{1}     THIS MATTER is before the court on Defendants Highwoods Realty Limited Partnership; Highwoods DLF 98/29, LLC; Highwoods DLF, LLC; and Highwoods Properties, Inc.'s Motion to Dismiss Plaintiffs' Complaint and on Thomas Linderman's Motion to Dismiss Re-Filed Action ("Motions") pursuant to Rules 12(b)(6) and 9(b) of the North Carolina Rules of Civil Procedure ("Rule" or "Rules").  For the reasons stated below, the Motions are GRANTED in part and DENIED in part.

> *Stark Law Group, PLLC by Thomas H. Stark and Penry Riemann, PLLC by Andy Penry for Plaintiffs.*
>
> *Manning, Fulton & Skinner, P.A. by Michael T. Medford for Defendants Thomas Linderman Graham, Inc. and Grubb & Ellis/Thomas Linderman Graham.*
>
> *Ellis & Winters LLP by Jonathan D. Sasser and Jeremy M. Falcone for Defendants Highwoods Realty Limited Partnership; Highwoods DLF 98/29, LLC; Highwoods DLF, LLC; and Highwoods Properties, Inc.*

Gale, Judge.

## I.  PARTIES

{2}     Plaintiffs are purchasers of tenant-in-common ("TIC") interests in five parcels of real property located at 3414 Duke Street, 4117 North Roxboro Road, 3404 North Duke Street, 4101 North Roxboro Road, and 4020 North Roxboro Road, all in Durham, North Carolina (collectively referred to as the "Subject Property"). (Compl. ¶ 46.)  Plaintiffs include the individual purchasers and the limited liability companies ("LLCs") formed by the individuals for the purpose of purchasing their interests and through which the interests were purchased.  (Compl. ¶¶ 2–31, 98.)

{3}     Defendant Highwoods DLF 98/29, LLC is a Delaware corporation with its principal place of business in Raleigh, North Carolina, and is the successor in interest to the seller of the Subject Property, Highwoods DLF 98/29, L.P.  (Compl. ¶ 32.)  Defendant Highwoods DLF, LLC, a Delaware LLC, was the sole general partner of Highwoods DLF 98/29, L.P.  (Compl. ¶ 33.)  Defendant Highwoods Realty Limited Partnership is a North Carolina limited partnership, and is the sole member of Highwoods DLF, LLC.  Defendant Highwoods Properties, Inc. is a Maryland corporation with its principal place of business in Raleigh, North Carolina, and is the sole general partner of Highwoods Realty Limited Partnership. These various Defendants are collectively referred to as "Highwoods."

{4}     Defendant Thomas Linderman Graham, Inc. ("TLG") is a North Carolina corporation with its principal place of business in Raleigh, North Carolina, and was retained by Highwoods as the exclusive selling agent for the Subject Property.  (Compl. ¶¶ 36, 63.)  TLG sometimes does business under the trade name Grubb & Ellis | Thomas Linderman Graham.  (Thomas Linderman's Br. in Supp. of Mot. to Dismiss Re-Filed Action (hereinafter "TLG Br. in Supp.") 6, 6 n.5.) Defendants TLG and Grubb & Ellis | Thomas Linderman Graham will collectively be referred to as "TLG."  TLG and the Highwoods Defendants will collectively be referred to as "Defendants."

## II.    INTRODUCTION

{5}    Plaintiffs brought suit against Highwoods and TLG alleging they made material misstatements which misled Plaintiffs into purchasing their TIC interests. After Highwoods retained TLG to seek a buyer for the Subject Property, TLG published a Confidential Offering Memorandum ("COM") to solicit potential purchasers. Triple Net Properties, LLC ("Triple Net") was selected as the final party with which Highwoods negotiated a binding purchase contract. Triple Net offered TIC interests in the Subject Property through a syndication which included a management contract, which it marketed with a Private Placement Memorandum ("PPM"). Highwoods deeded the separate TIC interests to the Plaintiff LLCs at closing, and Triple Net entered into contracts with Plaintiffs for management of the Subject Property. Highwoods was not a party to the PPM, retained no interest in the Subject Property after the sale, and was not involved in the ongoing property management after the sale.

{6}    In this action, Plaintiffs assert both common law claims and statutory claims under the Unfair and Deceptive Trade Practices Act ("UDTPA") and the North Carolina Securities Act ("NCSA"). Plaintiffs have separately sued Triple Net in an action now pending before this court, *NNN Durham Office Portfolio 1, LLC v. Grubb & Ellis Co.*, No. 10 CVS 4392, the pleadings of which are available at the court's website at www.ncbusinesscourt.net.

{7}    The Motions require that Plaintiffs' claims be assessed in accord with the recognized elements of the various common law claims and the UDTPA statutory claim, but further require the court to assess previously unsettled issues regarding the scope and application of the NCSA. In particular, the court must determine whether Plaintiffs have adequately pled that the TIC interests are a "security" subject to the NCSA, and if so, whether Plaintiffs have further alleged facts adequate to present either a primary or secondary liability claim against Defendants under that Act.

{8}     The court reserves further consideration as necessary for any final judgment, but it concludes for purposes of the present Motions that Plaintiffs purchased a "security" from Triple Net.  The court has further assumed without deciding that Plaintiffs can demonstrate a primary violation under the NCSA by Triple Net.  The court concludes Plaintiffs have adequately stated a claim of secondary liability against Defendants under the NCSA, that the conspiracy claim survives but must be restricted to conspiracy to violate the NCSA, and that Plaintiffs' other claims should be dismissed pursuant to Rule 12(b)(6).

## III.     PROCEDURAL HISTORY

{9}     Plaintiffs first brought suit in April 2010.  That case was dismissed without prejudice pursuant to Rule 41(a)(2) on July 6, 2011.  Plaintiffs timely re-filed the present lawsuit on July 6, 2012.  The case was designated to the Business Court by Order of Chief Justice Sarah Parker dated July 11, 2012 and assigned to the undersigned on July 12, 2012.

{10}     Plaintiffs bring claims for (1) fraud; (2) fraud in the inducement; (3) violation of the NCSA, N.C. GEN. STAT. §§ 78A-1–66 (2013); (4) violation of the UDTPA, N.C. GEN. STAT. §§ 75-1.1 (2012); (5) negligent misrepresentation; and (6) civil conspiracy.  (Compl. ¶¶ 224–66.)  Plaintiffs seek both compensatory and punitive damages pursuant to North Carolina General Statute § 1D-1.  (Compl. ¶¶ 267–71.)

{11}     The Highwoods Defendants filed their Motion to Dismiss on August 6, 2012, and TLG filed its Motion to Dismiss on August 23, 2012.  The Motions have been fully briefed, a hearing was held on November 19, 2012, and the matter is ripe for disposition.

# IV.    FACTUAL BACKGROUND

{12}    The court does not make findings of fact in connection with the Motions, as a motion to dismiss "does not present the merits, but only [determines] whether the merits may be reached." *Concrete Serv. Corp. v. Investors Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986).  The following facts are stated to provide context for the court's opinion and are construed in favor of the Plaintiffs, with the court drawing permissible inferences not inconsistent with the facts alleged.  The court is not required to accept Plaintiffs' legal conclusions.  Where appropriate, the court may, on a Rule 12(b)(6) motion, consider documents attached to or effectively incorporated by the allegations of the Complaint.  *Coley v. N.C. Nat'l Bank*, 41 N.C. App. 121, 126–27, 254 S.E.2d 217, 220 (1979); *Brackett v. SGL Carbon Corp.*, 158 N.C. App. 252, 255, 580 S.E.2d 757, 759 (2003).

## A.    Duke University As Tenants of the Subject Property

{13}    The Subject Property consists of five office buildings owned at relevant times by Highwoods.  In 2006 two tenants from Duke University Health System, Duke's Patient Revenue Management Organization ("PRMO") and Duke Pediatrics, together occupied 52% of the Subject Property's office space.  (Compl. ¶ 53.)  Duke PRMO's leases were set to expire in 2009 and 2010.  (Compl. ¶ 56.)

{14}    In September, 2006, Duke began considering the possible relocation of its PRMO from the Subject Property to Research Triangle Park in Raleigh, North Carolina and retained Corporate Realty Advisors ("CRA") to help it solicit bids to build a new PRMO facility.  (Compl. ¶¶ 57–58.)  Sometime prior to September 12, 2006, Highwoods indicated its willingness to build a new facility for PRMO and to accommodate PRMO's leaving the Subject Property prior to the expiration of its lease.  (Compl. ¶ 59.)  Around this same time CRA and Duke also discussed the possibility of building a new facility with another developer, Gary M. Hoch.  (Compl. ¶ 61.)

{15}    In or before October 2006, Highwoods decided to sell the Subject Property.  Highwoods executed an Exclusive Right to Sell Listing Agreement with TLG on October 24, 2006.  (Compl. ¶ 63; Compl. Ex. D.)

B.    TLG's Confidential Offering Memorandum and its Assessment of Duke's Renewal Probability

{16}    In November 2006, TLG prepared a Confidential Offering Memorandum ("COM") to solicit interest from potential purchasers of the Subject Property.  (Compl. ¶¶ 67–68; Compl. Ex. E.)  Its terms provided that information was "being provided solely to facilitate the Prospective Purchaser's own due diligence for which it shall be fully and solely responsible."  (Compl. Ex. E.)

{17}    The COM described Duke's strength as a primary tenant, the Subject Property's then-current tenancy of 99%, and the increasing value of the Durham real estate market.  (Compl. Ex. E.)  Plaintiffs allege that the COM makes the following "false statements of material facts":

- that "[v]alue-added opportunity exists as the majority of the portfolio will rollover in 2009 and 2010, allowing for renewals at the then market rate";
- "that the real estate market in Durham County was 'dramatically improving'" and "that rents would increase in 2007 and 2008"; and
- "that the renewal probability for [four of the five properties at the Subject Property] was 75%, and the renewal probability for [the fifth property] was 90%".

(Compl. ¶¶ 69–72.)  The COM indicated that the renewal probabilities were utilized in preparing a potential future cash flow for the Subject Property.  (Compl. Ex. E.)

{18}    In the earlier action, the court directed inquiries toward whether Plaintiffs were able to allege that they had seen or relied on any statement by Highwoods or TLG.  In their new complaint, Plaintiffs allege that the COM was at some point received by four of the thirty Plaintiffs, but do not allege through what path they received it.  (Compl. ¶¶ 200, 216, 219, 222.)  No such allegations were

made for the remaining twenty-six Plaintiffs. (Mem. of Law by Highwoods Realty Limited Partnership; Highwoods DLF 98/29, LLC; Highwoods DLF, LLC; and Highwoods Properties, Inc. in Supp. of Defs.' Mot. to Dismiss Pls.' Compl. (hereinafter "Highwoods Defs.' Br. in Supp.") 4.)

{19} On November 10, 2006, a TLG employee wrote an email seeking to value the Subject Property using lease renewal probabilities for Duke PRMO different from those stated in the COM. (Compl. Ex. G.) The email provides:

> [Another individual] has asked me to compile further valuations on the portfolio that take into account factors that we now know may be a possibility. The most dramatic is the possibility that Duke may not renew. Obviously, our marketing "story" will be predicated on the assumption that they will as will our valuation guidance to potential buyers. However . . . this exercise is necessary should Duke begin looking for alternative space during our marketing process. In fact, we decided to take this one step further. If Duke were to announce to a buyer during due diligence that they were leaving (most likely would not happen) then we would be left wondering what the properties [sic] worth is.

(Compl. Ex. G.) The email goes on to determine valuations for the Subject Property using renewal probabilities of 25% ("low buyer confidence in a Duke renewal") and 0% ("worst case scenario"). (Compl. Ex. G.)

{20} On December 6, 2006, Highwoods provided Duke with a formal bid to build a new facility for Duke PRMO. (Compl. ¶ 82.)

{21} On December 17, 2006, Jim McMillan of TLG ("McMillan") received from another prospective purchaser who had received the COM an email which assigned a value to the Subject Property of $20,145,000.00, which took into account that the purchaser would, "given the uncertainty of Duke renewing . . . underwrite an additional $3,500,000 for interest carry should [Duke] vacate." (Compl. Ex. K.; TLG Br. in Supp. 8.)

C.     Triple Net Selected As Purchaser

{22}     Triple Net submitted an "initial bid" of $32,800,000.00 to Defendants, which recites that it was "[b]ased on [Triple Net's] previous underwriting," and took into account Triple Net's own modified "market rent projections and renewal probabilities . . . ." (Compl. ¶ 87; Compl. Ex. I.) On December 19, 2006 Triple Net was invited to submit a "best and final bid." (Compl. ¶ 87.) On December 20, 2006 Brian McDonald of Triple Net emailed McMillan the following questions:

3.  Is there any reason why Duke hasn't negotiated previously for renewal options at below market rates?
4.  How much assurance could be given that Duke wouldn't expand to the point of vacating the entire premises for a new building upon lease expiration? Also, how much additional space do they occupy in the North Durham area? My guess is that Pediatrics wouldn't move further from Duke Medical Center but what about the PRMO group?

(Compl. Ex. J.) McMillan responded the same day:

3.  No reason that we know of. They have been expanding into the buildings and that has taken quite a bit of time. Landlord is not in a position to necessarily give rent away below market just because of the size of Duke. That location works very well for them and they are very well entrenched there. Their cost to move would be pretty large so the tenant has only so much bargaining power. Also, there is not another location in that submarket that could accommodate them.
4.  The assurance we can give is based on conversations with the real estate head. They have recently subleased the top floor of 3404 Duke Street from [another tenant]. They are only about ½ staffed now after 4 months. They overleased intentionally so that they could grow into that space over time. We were told that that was the last of the expansions that they will need for the foreseeable future. PRMO has 800 employees in this location and most live within 3-5 miles. They are very sensitive to not moving out of convenience for their employees and their access. These properties work very well in that regard and that is the reason that they have been in this location for so long and decided to grow into this location versus elsewhere. Very good amenities within walking distance and plenty of parking.

(Compl. Ex. J.)

{23}    On December 21, 2006, Danny Prosky of Triple Net submitted to TLG a final proposal to purchase the Subject Property for $34,200,000.00.  (Compl. ¶ 86; Compl. Ex. I.)  The final bid indicated Triple Net's intention to purchase the property with money raised through a TIC syndication.  (Compl. Ex. I, at ¶¶ 2–3.)

{24}    On December 22, 2006, McMillan informed Triple Net that Highwoods had chosen Triple Net as the purchaser.  (Compl. ¶ 90.)  Triple Net and Highwoods entered into a Purchase and Sale Agreement with an effective date of January 24, 2007.  (Compl. ¶ 110; Compl. Ex. N.)  Triple Net's obligation to proceed under the Purchase and Sale Agreement was conditioned on Duke having provided no written notice of any intention to abandon the leases.  (Compl. Ex. F., at 34–35.)

D.    Triple Net's Private Placement Memorandum

{25}    Triple Net published its Confidential PPM on January 5, 2007. (Compl. Ex. F, at iii.)

{26}    The PPM requires each investor to agree that "[h]e is basing his decision to invest on the [PPM and] . . . has relied on the information contained in said materials and has not relied upon any representations made by any other person . . . ."  (Compl. Ex. F, at 1.)

{27}    Under the section titled "RISK FACTORS", the PPM explained that tenants associated with Duke then occupied approximately 54% of the Subject Property.  It then described the potential impact of a non-renewal by the Duke tenants and others:

> [T]he PRMO group has subleased 33,500 square feet (or approximately 12% of the entire Property) . . . from Qualex, Inc. and occupies most of this space. . . . The leasing broker who placed Duke within this space indicated that the PRMO group intends to grow into this space over time and may stay following the expiration of the Qualex lease. However, no assurance can be given that the PRMO group will lease this space following the Qualex expiration in 2010. . . . Any large-scale departure by Duke would significantly affect the cash flow and fair market value of the Property and the economic viability of the Property would be jeopardized . . . .

> [L]eases with all of the tenants, representing 100% of the Property, will expire within the next 3 calendar years. . . . [I]f the tenants do not renew their leases or downsize the space leased, the Property would suffer vacancy when the leases expire and no assurance can be given that the Property Manager would be successful in re-leasing the vacant space.

(Compl. Ex. F, at 9.)

{28} The PPM again discusses the risks and probability of Duke not renewing in a section titled "Business Plan," which is prefaced with the statement that it "contains information researched by [Triple Net Properties, LLC], some of which was prepared by Grubb & Ellis | Thomas Linderman Graham (the broker for the Seller) and is based solely on the [Triple Net Properties, LLC's] investigation of the Property, its location in the Durham, North Carolina office market and the tenants." (Compl. Ex. F, at 39.) It goes on to state that Triple Net believes that Duke will renew "[b]ased on Duke's longevity as a tenant at the Property," the Subject Property's proximity to Duke Regional Hospital and Duke University, and the lack of other suitable space. (Compl. Ex. F, at 40.) The PPM then discusses the Raleigh-Durham Economy and the North Durham Submarket, information it specifically states came from a different third-party source. (Compl. Ex. F, at 40–41.) Finally, the PPM notes that:

> Based upon the importance of Duke's tenancy to the Property, the Manager intends to engage Duke regarding extending their respective leases. This will help reduce the uncertainty surrounding the expiration of their leases. . . . However, there can be no assurance that [the Duke tenants] will in fact extend their leases at the Property.

(Compl. Ex. F, at 40.)

{29} The PPM contains probability assumptions that are different from and lower than those that TLG stated in the COM. The PPM assigned a 75% renewal probability to four of the five buildings and a 50% renewal probability to the fifth. (Compl. Ex. F, at 9.)

{30} Every Plaintiff received the PPM before closing. (Compl. ¶ 105.) In addition to receiving the PPM, some Plaintiffs allegedly received oral

representations that Duke was likely to renew its leases from their own brokers (Compl. ¶¶ 136, 147, 150, 153, 156, 165, 174, 177, 180, 183, 186, 189, 192, 195, 213), from Triple Net employees (Compl. ¶¶ 141, 144, 159, 162, 168, 198, 204, 207, 210, 216, 219), or from unnamed TLG representatives (Compl. ¶¶ 201, 222).

### E.    Triple Net's Due Diligence Period

{31}    Triple Net's due diligence period began on January 8, 2007 when Triple Net confirmed receipt of due diligence materials from Highwoods (Compl. ¶ 111), and ran through January 24, 2007, pursuant to the terms of the Purchase and Sale Agreement. (Compl. Ex. N, at 12.)

{32}    During this period, Duke was continuing to consider the possibility of relocation. On January 10, 2007, David Linder ("Linder") of Highwoods sent a letter to Duke's agent CRA regarding a "Proposed Assumption of [Duke's] Office Leases" at two of the locations at the Subject Property. (Compl. Ex. O.) The email advised CRA that "[i]n the event a building is constructed by Highwoods and occupied by Duke; upon lease commencement of the new building, Highwoods . . . agrees to assume the lease obligations for the above referenced Leases." Randall Massey, another Highwoods employee, forwarded the letter to other Highwoods employees and expressed that "[p]rior to receipt [of the letter], I was not aware it was even a topic of discussion." Massey continued, giving some background to the letter as follows:

> Duke's PRMO group currently leases the 4101 and Fairfield 1 buildings. The leases expire 06/30/10 and encompass . . . about 39% of the total N Durham campus. Duke has informed us that these properties are not well suited for this PRMO group. There were some very preliminary discussions with HIW about developing a build to suit property and allowing PRMO to exit the N Durham leases early. The RTP Division should speak to the current prospects of ever doing such a deal, but at this point, it is my sense that the probability remains pretty low. In the meantime, we are trying to sell the N Durham portfolio and that is no doubt what generated the attached letter.

(Compl. Ex. O.)

{33}    On January 19, 2007, a meeting was held between Mike Waddell of Triple Net, Scott Selig of Duke University, Jim McMillan of TLG, and Charles Ostendorf ("Ostendorf") and David Lindner of Highwoods. (Compl. ¶ 114.) After the meeting, Ostendorf took Mike Waddell on a tour of the Subject Property. (Compl. ¶ 116.) Later summarizing the tour in an email, Ostendorf commented that:

> Mike asked me if I thought Duke would move – I replied that as frugal as they were I did not see it if the owner presented them with a very economical long term deal and perhaps gave them some space planning dollars.  I did not see them as willing to pay the premium for new space.  His reply was that the new space was viable if it was more efficient for them.

(Compl. Ex. P.)

{34}    On or before February 19, 2007, Duke informed Highwoods that it was one of two finalists to compete for building a new Duke PRMO facility. (Compl. ¶ 119.)


F.    Closing and Post-Closing

{35}    The sale of the Subject Property closed on March 12, 2007. (Compl. ¶ 122.) At closing, Highwoods deeded the TIC interests directly to the individual Plaintiffs. (Compl. ¶¶ 121–22.) About that same time Plaintiffs also entered into contracts with Triple Net governing the management of the Plaintiffs' interests in the Subject Property.

{36}    From January through March, 2007, Triple Net's parent, NNN Realty, and Grubb & Ellis, Inc. were negotiating a potential merger. Plaintiffs complain that Triple Net did not disclose this to Plaintiffs. (Compl. ¶ 126.) The companies announced their merger on May 22, 2007. (Compl. ¶ 127.) Plaintiffs have not alleged facts which tie TLG to Grubb & Ellis or to negotiations between Grubb & Ellis and Triple Net.

{37}    Ultimately, Duke University remained at the Subject Property through the lease terms but did not then renew its leases.  Other tenants also did not renew. (Compl. ¶ 123.)  The Subject Property was sold in a foreclosure sale in October 2011. (Compl. ¶ 123.)

## V.    STANDARD OF REVIEW

{38}    The appropriate inquiry on a motion to dismiss pursuant to Rule 12(b)(6) is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Crouse v. Mineo*, 189 N.C. App. 232, 237, 658 S.E.2d 33, 36 (2008) (quoting *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987)).

## VI.    ANALYSIS

A.    The North Carolina Securities Act

{39}    There is, to date, limited case law developed under the NCSA.[1]  The court first addresses whether the TIC interests were a "security" and then discusses the overall liability scheme under the NCSA to determine the elements of claims for primary or secondary liability that Plaintiffs must satisfy to state claims against the Defendants in this action.

1.    The TIC Interests As "Securities"

{40}    The NCSA regulates transactions involving securities, and defines "security" as:

---

[1] Some courts have considered whether the National Securities Markets Improvement Act of 1996 ("NSMIA") preempts some state regulation of securities. *See, e.g., Capital Research & Mgmt. Co. v. Brown*, 53 Cal. Rptr. 3d 770 (Cal. Ct. App. 2007); *People v. Greenberg*, 946 N.Y.S.2d 1 (2012). However, the NSMIA explicitly preserves state jurisdiction with regard to actions involving fraud or deceit. *Capital Research*, 53 Cal. Rptr. 3d at 775–76; *Greenberg*, 946 N.Y.S.2d at 6–7. The parties did not raise a preemption issue and the court does not believe Plaintiffs' claims in this action are preempted by the NSMIA.

any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; . . . investment contract . . .; or, in general, any interest or instrument commonly known as a "security[.]"

N.C. GEN. STAT. § 78A-2(11) (2013). The immediate question becomes whether Plaintiffs entered investment contracts which may be appropriately classified as securities.

{41} The overall transaction at issue included two components: the sale of the real estate interests in the Subject Property, and the packaging of the individual TIC interests in the real estate with a property management contract by which Plaintiffs ceded control of their property interest in exchange for investment returns. The court does not believe that the sale of fractional real estate shares alone would be a securities transaction. *See, e.g., Hocking v. Dubois*, 839 F.2d 560, 564 (9th Cir. 1988) ("Generally, simple transactions in real estate, without more, do not satisfy the *Howey* criteria"), *en banc reh'g granted by* 852 F.2d 503 (9th Cir. 1988); *Woodward v. Terracor*, 574 F.2d 1023, 1025 (10th Cir. 1978) (finding defendant did not sell a security because it was "under no contractual obligation to the plaintiffs other than to deliver title . . . . Unlike *Howey*, [defendant] was not under any collateral management contract with the purchasers of its land"); *Johnson v. Nationwide Indus., Inc.*, 450 F. Supp. 948, 952–53 (N.D. Ill. 1978) (noting that the SEC has previously issued a release concluding that the offer of real estate alone, without any collateral arrangements, is not the offer of a security).

{42} Standing alone, a TIC interest is simply an undivided share in real property "with each person having an equal right to possess the whole property" even though each TIC interest is owned as a "separate and distinct title[]." 20 AM. JUR. 2D *Cotenancy and Joint Ownership* § 32 (2012). As a general proposition, a TIC interest may become a security when it is sold as a part of a securitized transaction in which investors are solicited to pool their assets to purchase a common property and the investors do not manage or operate the property themselves, but rather the property is to be operated and managed by either the

seller of the interests or by a third party.  *See Tenants-In-Common Interests*, REALTORS COM. ALLIANCE SERIES: HOT TOPICS-ANSWERS TO CURRENT BUS. ISSUES (Nat'l Ass'n of Realtors, Chi., Ill.), Fourth Quarter, 2005, at 1–2.

{43}   In the typical TIC investment transaction, an investment company (the "sponsor") identifies an investment property, performs due diligence, purchases the investment property, and then markets individual TIC interests in the property to a set of investors, often through investment brokers.  (Compl. ¶ 96.)  The TIC interests are typically sold as a package combined with a property management contract.  Post-closing, the sponsor, or an affiliate of the sponsor, manages and operates the property while distributing profits to the investors.

{44}   North Carolina courts have not to date been asked to consider whether TIC interests are securities within the meaning of the NCSA.  There appears to be a growing national consensus that at least some TIC interests are securities under federal securities law, which defines a "security" in a similar fashion to the NCSA. David Rich, *Betting the Farm: The TIC Turf War and Why TICs Constitute Investment Contracts Under Federal Securities Laws*, 1 WM. & MARY BUS. L. REV. 450, 453 (2010) [hereinafter *Betting the Farm*].

{45}   The SEC has issued letters stating its opinion that such interests may be securities under the federal Securities Act of 1933.  (Compl. Ex. L.); Triple Net Leasing, LLC, SEC No-Action Letter, 2000 SEC No-Act. LEXIS 824 (Aug. 23, 2000). Further, the National Association of Securities Dealers (NASD) published a Notice to Members indicating its belief that TIC interests may be securities under federal securities law.  *See* NAT'L ASS'N OF SEC. DEALERS, NOTICE TO MEMBERS 05-18 3 (2005), *available at* http://www.finra.org/web/groups/industry/@ip/@reg/@notice/ documents/notices/p013455.pdf.

{46}   A TIC interest coupled with a management contract is thought to fit into the category of an "investment contract" included in the broader definition of "security."  The United States Supreme Court defines an "investment contract" as including any "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the

promoter or a third party . . . ." *SEC v. W.J. Howey, Co.*, 328 U.S. 293, 298–99 (1946). The *Howey* definition encompasses four elements: (1) an investment of money, (2) in a common enterprise, (3) an expectation of profits, and (4) the expectation that profits will arise solely from the efforts of the promoter or a third party. *See Betting the Farm*, at 461. Similarly, North Carolina defines "investment contract" as follows:

> [a]ny investment in a common enterprise with the expectation of profit to be derived through the essential managerial efforts of someone other than the investor [and] . . . [a]ny investment by which an offeree furnishes initial value to an offeror, and a portion of this initial value is subjected to the risks of the enterprise, and the furnishing of this initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind over and above the initial value will accrue to the offeree as a result of the operation of the enterprise, and the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise.

18 N.C. ADMIN CODE 6A.1104(8)(a-b) (2012). A common investment is "an enterprise in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of a third party . . . ." 18 N.C. ADMIN CODE 6A.1104(8)(a) (2012).

{47}  Questions arise in applying the *Howey* standard whether a sponsor's efforts in packaging and managing the TIC interests *before* the closing of the TIC transaction can satisfy the "efforts of a third party" requirement, or whether only the sponsor's post-closing management of the property may be considered. *See Betting the Farm*, at 463, 467–70.

{48}  The court concludes Plaintiffs have pled the elements of an investment contract sufficient to survive a Rule 12(b)(6) motion. Plaintiffs allege that they invested money with an expected return of profits on their investments. (Compl. ¶¶ 117, 120, 123, 126, 129, 132, 135, 138, 141, 144, 147, 150, 153, 156, 159, 162, 165, 168, 171, 174, 177, 180, 183, 186, 189, 192, 195, 198, 201, 204; Compl. Ex. F, at 5–6 (describing the objectives of the transaction).) Plaintiffs have also pled that the

investments were in a common enterprise: the Plaintiffs pooled their money together in a common investment, the rental income from the leasing of the Subject Property was pooled and distributed to Plaintiffs on a pro rata basis, and the success of any one Plaintiff's investment depended upon the success of the entire enterprise. (Compl. Ex. F.) Lastly, Plaintiffs have pled that they did not have the right to control or manage the property post-closing, but instead expected to earn profits from the managerial efforts of third parties. (Compl. Ex. F, at ii, 5 ("Triple Net Properties Realty, Inc. . . . will serve as property manager of the Property. The [purchasers] will not be involved in the day-to-day management of the Property. . . . [Triple Net Properties Realty, Inc.] reserves the right, in its sole discretion, to subcontract with local property managers and certain other parties to perform some or all property management functions . . . .").) Plaintiffs have sufficiently alleged that they did "not receive the right to exercise practical and actual control over the managerial decisions of the enterprise" post closing. 18 N.C. ADMIN CODE 6A.1104(8)(a-b) (2012). On February 2, 2007, Triple Net also filed a Form "REGDEX – Notice of Sale of Securities with the SEC" (Compl. Ex. M), and purportedly filed exemption documents required by the NCSA with the North Carolina Secretary of State (Compl. ¶ 100), indicating its belief that the TIC interests are securities under federal and state law.

{49} Triple Net's liability as the seller of these securities is the subject of a separate pending action. When applying the NCSA to the Defendants in this action, the Court separately addresses whether Highwoods or TLG became a "seller" or "offeror" because Highwoods deeded the fractional interests directly to Plaintiffs, but having no involvement in the management component of the transaction. Before doing so, the court first further describes the general liability scheme under the NCSA and how it separately treats primary liability for offerors and sellers, and secondary liability for those who are associated with or who materially aid one who is primarily liable.

2.  <u>Civil Liability Under the NCSA</u>

{50}    The NCSA recognizes three different categories of persons and approaches liability against these different persons from different perspectives and with different allocations of the burden of proof.  Section 78A-56(a) ("Section 56(a)" or "§ 56(a)") of the NCSA imposes what the court refers to as "primary liability" on one who sells or offers for sale a security.  If primary liability exists, § 78A-56(c) ("Section 56(c)" or "§ 56(c)") of the NCSA then imposes "secondary liability" on two categories of persons, first those persons enumerated in § 56(c)(1), and second those not included within § 56(c)(1) who "materially aided" in the transaction on which the primary liability is based.  A plaintiff has a heightened burden of proof when seeking to impose secondary liability on those outside the scope of § 56(c)(1).

{51}    The NCSA delineates two different pathways to primary liability.  One pathway sounds in fraud, comparable to common law fraud, and is represented by Section 78A-8 of the NCSA ("Section 8" or "§ 8"), of which violations in part are made actionable under § 56(a)(1).  Those claims are generally comparable to federal actions grounded on Rule 10b-5 promulgated under Section 10(b) of the Securities Act of 1934.  *Compare* N.C. GEN. STAT. § 78A-8 (2013) *with* 17 C.F.R. 240.10b-5 (2013).  The second pathway is through making false or misleading statements and is represented by § 56(a)(2), which is more comparable to federal claims grounded on § 12(a)(2) of the Securities Act of 1933 ("1933 Act").  *Compare* N.C. GEN. STAT. § 78A-56(a)(2) (2013) *with* 15 U.S.C. § 77l(a)(2) (2013).  Each of these liability schemes include certain limitations and allow for certain defenses.  Claims based on fraud must include allegations and proof typical of common law fraud claims, and once the plaintiff satisfies its *prima facie* case, the defendant is not afforded an affirmative defense based on lack of knowledge.  *See* N.C. GEN. STAT. §§ 78A-8, -56(a)(1) (2013).  Claims based on false or misleading statements may proceed without the more exacting proof of fraud, but liability must be tied to statements which were actually made, and the defendant is given the affirmative defense that it did not know, and in the exercise of reasonable care could not have known, of the

untruth or omission.  *See* N.C. GEN. STAT. § 78A-56(a)(2) (2013).  Neither of the liability schemes imposes a general "duty to speak."

{52}   The NCSA provides its own remedy scheme which is more restrictive than at least some of the corresponding federal claims.  Actions under either § 56(a)(1) or § 56(a)(2) are limited generally to recovery of the consideration paid for the security.  N.C. GEN. STAT. § 78A-56(a) (2013) (the purchaser "may sue either at law or in equity to recover the consideration paid for the security").

{53}   In order to establish a plaintiff's pleading burden, it is important to determine whether the claim of primary liability is being brought pursuant to § 56(a)(1) which provides a civil remedy for violations of certain subsections of § 8 proscribing fraudulent conduct, or pursuant to § 56(a)(2) based on a false or misleading statement.

a.   <u>Primary Liability Claims under NCSA Sections 56(a)(1) and 56(a)(2)</u>

{54}   Section 78A-56(a) recognizes these two separate claims when it imposes liability on:

(a) Any person who:

(1) Offers or sells a security in violation of G.S. 78A-8(1) [or] 78A-8(3) . . . , or

(2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission . . .

{55}   The NCSA defines "sell" as including "every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value," and defines "offer" or "offer to sell" as including "every attempt or offer to dispose of, or

solicitation of an offer to buy, a security or interest in a security for value." N.C. GEN. STAT. § 78A-2(8)(a)–(b) (2013).

### i.     Liability Under Section 56(a)(1)

{56}    Insofar as relevant here, a claim under § 56(a)(1) is based on a violation of subsections (1) or (3) of § 8 which provides:

> It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:
>
> (1) To employ any device, scheme, or artifice to defraud, [or] . . .
>
> (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

N.C. GEN. STAT. § 78A-8 (2013).

{57}    While § 8 proscribes conduct by "any person," a civil action for its violation depends on § 56(a)(1), which provides primary liability only for one who offers or sells a security. There is no basis for finding a legislative intent to provide any broader private remedy for a violation of § 8.

{58}    Courts have not yet defined the exact elements of a claim under § 56(a)(1). Section 8 of the Act "closely parallels the Rule 10(b)-5 antifraud provision of the Securities Exchange Act," and "[c]ases construing the federal rule are instructive when examining our statute." *State v. Davidson*, 131 N.C. App. 276, 282–83, 506 S.E.2d 743, 748 (1998). In addition to elements necessary to satisfy federal jurisdiction, the elements of a cause of action under Rule 10b-5 include: (1) the making of a false statement or omission of material fact or the use of a fraudulent device in connection with the purchase or sale of any security; (2) made with scienter; (3) upon which the purchaser justifiably relies; and (4) proximate causation. *Sec. Exch. Comm'n v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2nd Cir. 1999); *Krim v. Coastal Physician Grp., Inc.*, 81 F. Supp. 2d 621, 626 (M.D.N.C.

1998) (citing *Gasner v. Bd. of Supervisors of Dinwiddie, Va.*, 103 F.3d 351, 356 (4th Cir. 1996)).

### (1). Scienter and Justifiable Reliance

{59}    The court likewise now concludes that scienter and justifiable reliance are elements of a violation of § 8(1) or (3) which is made actionable through § 56(a)(1), as those subsections of § 8 are clearly grounded on fraud.  Judge Murphy of this court determined that scienter is not necessarily a required element of a claim under § 56(a)(2) which can also be grounded on negligence. *Associated Packaging, Inc. v. Jackson Paper Mfg. Co.*, 2012 NCBC LEXIS 13, at *41–48 (N.C. Super. Ct. Mar. 1, 2012).  Judge Murphy's holding is consistent with federal cases decided under § 12 of the 1933 Act, which the language of § 56(a)(2) parallels. *Venturtech II, L.P. v. Deloitte Haskins & Sells*, 790 F. Supp. 576, 588 (E.D.N.C. 1992).

{60}    Scienter requires "both knowledge and an intent to deceive, manipulate, or defraud." *Latta v. Rainey*, 202 N.C. App. 587, 600, 689 S.E.2d 898, 909 (2010).  While scienter is typically the term used in analyzing claims for securities law violations, it is equivalent to the element of intent required for claims of common law fraud under North Carolina law. *See id.* at 600, 689 S.E.2d at 909; *Libby Hill Seafood Rests., Inc. v. Owens*, 62 N.C. App. 695, 698, 303 S.E.2d 565, 568 (1983) (elements of fraud include knowledge that the representation was false and that the representation be made with the intent to deceive).

{61}    The legislature's intent to follow traditional fraud procedures for claims under § 56(a)(1) is further evidenced by the fact that § 56(a)(1) does not include the affirmative defense allowed by § 56(a)(2), which allows an offeror or seller to escape liability for a false or misleading statement if he proves "that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission."  And, to the extent that § 56(a)(1) should be interpreted based on federal precedent pursuant to Rule 10b-5, scienter and justifiable reliance are elements of 10b-5 claims. *See Krim*, 81 F. Supp. 2d at 626.

(2).   Satisfying Rule 9(b)'s Particularity Requirement

{62}   It being evident that liability under § 56(a)(1) is grounded in fraud, it follows that claims based on that section must comply with North Carolina Rule of Civil Procedure 9(b) ("Rule 9(b)"), which requires that averments of fraud "be stated with particularity." N.C. R. CIV. P. 9(b); *Associated Packaging*, 2012 NCBC LEXIS 13, at *49; *see Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981).

{63}   In sum, to state a claim under § 56(a)(1), a plaintiff must plead with particularity that (1) defendant is a seller or offeror of a security who either (a) "employ[ed] any device, scheme, or artifice to defraud", or (b) "engage[d] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person"; (2) defendant acted with scienter; and (3) plaintiff justifiably relied. N.C. GEN. STAT. § 78A-8(1), (3) (2013).[2]

ii.   Liability Under Section 56(a)(2)

{64}   Section 56(a)(2) provides a cause of action against the offeror or seller of a security who (1) makes any untrue statement of a material fact, or (2) fails to state a material fact necessary for a statement which was made to not be misleading. A seller or offeror may escape liability from such statement or omission if he can prove that "he did not know, and in the exercise of reasonable care could not have known[] of the truth or omission." N.C. GEN. STAT. § 78A-56(a)(2) (2013).

{65}   Like § 56(a)(1), § 56(a)(2) does not impose a general duty of disclosure. Liability must be tied to a statement which was untrue or which was made misleading by omissions. *See, e.g.*, *In re Union Carbide Class Action Sec. Litig.*, 648 F. Supp. 1322, 1325–26 (S.D.N.Y. 1986) (interpreting Rule 10b-5 and § 12(a)(2)). Section 56(a)(2) does not on its own then alter the general rule which imposes no general duty of disclosure in commercial real estate transactions. *See C.F.R. Foods, Inc. v. Randolph Dev. Co.*, 107 N.C. App. 584, 589, 421 S.E.2d 386, 389 (1992)

---

[2] The court does not here address elements required in a state enforcement action under § 8. Likewise, the court does not address other elements of federal 10b-5 claims such as loss causation, but the court notes that such considerations may be unnecessary in light of the NCSA's limitation to a rescission remedy.

(noting that there is "no duty of disclosure" in a "transaction involving commercial real estate between two commercial parties").

{66} Section 56(a)(2) does not additionally require proof of scienter or justifiable reliance. Unlike § 56(a)(1) which parallels anti-fraud provisions of federal Rule 10b-5, § 56(a)(2) parallels § 12(a)(2) of the 1933 Act and "cases construing § 12[a](2) should be considered when interpreting § 78A-56." *Venturtech II, L.P.*, 790 F. Supp. at 588 (citing *State v. Williams*, 98 N.C. App. 274, 390 S.E.2d 746 (1990)); *see* Securities Act of 1933 § 12(a)(2), 15 U.S.C. § 77l(a)(2) (2013). Like its federal counterpart, § 56(a)(2) allows a claim against an offeror or seller based on either fraud or negligence. *Associated Packaging*, 2012 NCBC LEXIS 13, at *48; *see Andrews v. Fitzgerald*, 823 F. Supp. 356, 370 (M.D.N.C. 1993) (stating that scienter is not an element of a cause of action under § 12(a)(2)).

{67} Certain other principles logically follow. The heightened pleading standards of Rule 9(b) do not apply where the action is grounded on negligence, but rather Rule of Civil Procedure 8(c) controls. *Associated Packaging*, 2012 NCBC LEXIS 13, at *49–50. Likewise, the § 56(a)(2) plaintiff need not prove justifiable reliance. The policies underlying a requirement for justifiable reliance in a fraud claim are instead satisfied by limiting liability to actual material false or misleading statements. North Carolina courts have adopted the definition of materiality used by the federal courts, which provides that a fact is material when "there is a substantial likelihood that a reasonable purchaser would consider it important in deciding whether or not to purchase." *Williams*, 98 N.C. App. at 280, 390 S.E.2d at 749 (alterations in original omitted) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

{68} In sum, the elements of a claim under § 56(a)(2) include: (1) a statement which was false or misleading, or which under the circumstances was false or misleading because of the omission of other facts (the purchaser not knowing of the untruth or omission); (2) that such statement was material; and (3) that such statement was made by one who offered or sold a security. The offeror or seller may escape liability for such a false or misleading statement if he can show

that he did not know and in the exercise of reasonable diligence could not have known that the statement was false or misleading.

 

    b.    <u>Secondary Liability Under Section 56(c)</u>

{69}    Assuming that a plaintiff can demonstrate that an offeror or seller is liable under § 56(a)(1) or § 56(a)(2), a plaintiff may then further extend liability under the NCSA to a secondary group of persons. The peculiar language of the NCSA extends potential secondary liability further than either the federal securities laws or the Uniform Securities Act, which the language of North Carolina's act parallels in many respects. Like the offerors or sellers facing primary liability, a group of persons exposed to secondary liability under § 56(c)(1) are given an affirmative defense similar to that afforded offerors and sellers. But North Carolina's § 56(c)(2) also extends secondary liability to include "every other person who materially aids in the transaction" but as to this extended group of persons the plaintiff must prove the defendant actually knew of the factual predicate of the primary liability. The relevant text of § 56(c) is as follows:

(c)

    (1) Every person who directly or indirectly controls a person liable under subsection (a), (b), or (b1) of this section, every partner, officer, or director of the person, every person occupying a similar status or performing similar functions, and every dealer or salesman who materially aids in the sale is also liable jointly and severally with and to the same extent as the person, unless able to sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

    (2) Unless liable under subdivision (1) of this subsection, every employee of a person liable under subsection (a), (b), or (b1) of this section who materially aids in the transaction giving rise to the liability and every other person who materially aids in the transaction giving rise to the liability is also liable jointly and severally with and to the same extent as the person if the employee or other person actually knew of the

existence of the facts by reason of which the liability is alleged to exist.

N.C. GEN. STAT. § 78A-56(c) (2013).


### i.    Primary Violation

{70}    To bring a claim for liability under § 56(c)(1) or (2), a plaintiff must first plead a primary violation under § 56(a), (b), or (b1) (and here only § 56(a) is relevant).  *See Venturtech II, L.P.*, 790 F. Supp. at 589 (noting that a cause of action for aiding and abetting a securities violation first requires "a primary violation by another person"); *Hunt v. Miller*, 908 F.2d 1210, 1214 n.5 (4th Cir. 1990) (stating courts have looked to the analogous federal control person liability statutes, such as 15 U.S.C. § 77o, when interpreting § 75A-56(c)); *Jenkins v. Fidelity Bank*, 365 F. Supp. 1391, 1402 (E.D. Pa. 1973) ("The availability of [15 U.S.C. §77o, the control person liability provision of the Securities Act of 1933] turns upon the presence, inter alia, of liability of a controlled person under § 11 or 12 of the [1933 Act]"); *DuPont v. Wyly*, 61 F.R.D. 615, 626 (D. Del. 1973) ("'Controlling' persons are liable only when the 'controlled' seller is himself liable . . .").  Once secondary liability is demonstrated, such liability is joint and several with the primary liability.


### ii.    "Materially aid"

{71}    Section 56(c) speaks in terms of those who "materially aided" in the transaction on which primary liability is based.  Neither the statute nor North Carolina courts define the term "materially aid."  Courts in other states have considered the term, but in the context of the language of the particular state statute before them, which may include significant variations from North Carolina's statute.

{72}    Liability based on "materially aiding" arguably is comparable to tort liability based on "aiding and abetting."  Traditional tort aiding and abetting claims require the alleged aider and abettor to have provided "substantial assistance" in carrying out the primary violation.  *See* RESTATEMENT (SECOND) OF TORTS § 876

(1979); Jennifer J. Johnson, *Secondary Liability for Securities Fraud: Gatekeepers in State Court*, 36 DEL. J. CORP. L. 463, 484 (2011) [hereinafter *Secondary Liability for Securities Fraud*]. Federal securities law does not generally recognize an aiding and abetting cause of action under Rule 10b-5, and may not recognize it pursuant to § 12(a)(2). *Central Bank of Denver, N. A. v. First Interstate Bank, N. A.*, 511 U.S. 164, 179 (1994), ("none of the express causes of action in the [1934] Act further imposes liability on one who aids or abets a violation") *superseded by statute*, Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.) ("PSLRA"); *Secondary Liability for Securities Fraud*, at 473 (noting that most courts have extended the reasoning articulated in *Central Bank* for precluding an aiding and abetting cause of action under Rule 10b-5 to § 12(a)(2)). The PSLRA, enacted the year after the Supreme Court's decision in *Central Bank,* allows the SEC to pursue aiding and abetting liability against "any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this title . . . ." 15 U.S.C.S. § 78t(e) (2013). The PSLRA does not, however, create a private cause of action for aiding and abetting. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 162 (2008).

{73}    The Second Circuit has interpreted the PSLRA's "substantial assistance" standard to require the SEC to prove that the defendant "in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (alterations in original) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). In *Apuzzo*, the Court of Appeals held that the SEC's claim for aiding and abetting a securities law violation survived a motion to dismiss because the defendant "retained ultimate control over the transaction, negotiated its key terms . . . , approved the agreements," and knew about the issuance by the alleged primary violators of invoices inflated to reflect a higher value for equipment sold. *Id.* at 209–10, 214 n.12.

{74}   Some state courts have interpreted a "material aid" standard imposed by their securities statute as encompassing broader conduct than that captured by a traditional "substantial assistance" standard and broader than conduct needed to satisfy the "substantial factor" test used to determine liability under § 12 of the 1933 Act. *See Foster v. Jesup & Lamont Secs. Co.*, 482 So. 2d 1201, 1206–07 (Ala. 1986) (rejecting the "substantial factor" test and noting that Alabama's "materially aids" standard is "considerably broader"); *Klein v. Oppenheimer & Co., Inc.*, 130 P.3d 569, 584 (Kan. 2006); *Secondary Liability for Securities Fraud* at 484.  For example, the Supreme Court of Connecticut held that "aid is material if it has a natural tendency to influence, or was capable of influencing, the decision of the purchaser." *Conn. Nat'l Bank v. Giacomi*, 242 Conn. 17, 52–53 (1997) (internal quotation marks omitted) (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988) (interpreting CONN. GEN. STAT. § 36-498, now codified at § 36b-29).

{75}   Oregon's secondary liability statute provides that "every person who participates or materially aids in the sale is also liable . . . unless the nonseller sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care, could not have known, of the existence of the facts on which the liability is based." ORE. REV. STAT. § 59.115(3) (2012).  The Oregon Supreme Court interpreted this language in *Prince v. Brydon* when construing the statute in the context of a lawyer's potential liability.  764 P.2d 1370, 1371 (Or. 1988).  The court held that:

> [w]hether one's assistance in the sale is 'material' does not depend on one's knowledge of the facts that make it unlawful; it depends on the importance of one's personal contribution to the transaction.  Typing, reproducing, and delivering sales documents may all be essential to a sale, but they could be performed by anyone; it is a drafter's knowledge, judgment, and assertions reflected in the contents of the documents that are 'material' to the sale.

*Id.* at 1371.

{76}    Many state statutes are modeled on the secondary liability provisions of Section 509 of the Uniform Securities Act, which provides in part that "[t]he following persons are liable jointly and severally with" a primary violator:

(1)    a person that directly or indirectly controls a person liable under [the primary violation sections] . . . ;

(2)    an individual who is a managing partner, executive officer, or director of a person liable under [the primary violation sections] including an individual having a similar status or performing similar functions . . . ;

(3)    an individual who is an employee of or associated with a person liable under [the primary violation sections] and who materially aids the conduct giving rise to the liability . . . ; and

(4)    a person that is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability under [the primary violation sections] . . .

"unless the [ ] person sustains the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." UNIF. SECURITIES ACT § 509(g) (2002). An official comment to another section of the Uniform Securities Act of 2002 notes that "[a]s with Sections 509(g)(3) and (4), materially aid . . . does not include ministerial or clerical acts." UNIF. SECURITIES ACT § 603 cmt. 4 (2005).

{77}    Section 56(c)(1) of the NCSA is comparable to § 509 of the Uniform Securities Act, except that North Carolina does not include employees under § 56(c)(1), instead including them under § 56(c)(2). Section 56(c)(2) of North Carolina's statute also adds a provision not included in the Uniform Securities Act and reaches "every other person" who materially aids in the securities transaction. But, notably, § 56(c)(2) requires the plaintiff to prove that a defendant under that section actually knew the factual predicate on which primary liability is based, rather than placing the burden on defendant of proving the affirmative defense provided in § 56(c)(1).

{78}    There is no case law in North Carolina construing the concept of aiding and abetting a securities violation. In fact, there is limited North Carolina law

examining aider and abettor liability in any civil context. North Carolina has at least in some instances adopted the Restatement (Second) of Torts § 876, which incorporates the "substantial assistance" standard. *See Tong v. Dunn*, 2012 NCBC LEXIS 16, at \*26 n.3 (N.C. Super. Ct., Mar. 19, 2012); RESTATEMENT (SECOND) OF TORTS § 876 (1979). However, the North Carolina Court of Appeals has indicated that § 876 should be applied restrictively, and that aiding and abetting is considered in the nature of inciting conduct or taking concerted action. *Hinson v. Jarvis*, 190 N.C. App. 607, 611–13, 660 S.E.2d 604, 608 (2008). This court has stated that if a claim for aiding and abetting a breach of fiduciary duty exists at all, it will require proof that the "aiding and abetting party [] have the same level of culpability or scienter" as the primary tort-feasor. *Tong*, 2012 NCBC LEXIS 16, at \*26 (citing *Sompo Japan Ins. Inc. v. Deloitte & Touche, LLP*, 2005 NCBC LEXIS 1, at \*12 (N.C. Super. Ct., June 10, 2005)).

{79}  While the court reserves a final determination of a comprehensive definition of "materially aid," for purposes of the present Rule 12(b)(6) motion the court will require allegations of conduct which rises to the level of having contributed substantial assistance to the act or conduct leading to primary liability under the NCSA, and, when later assessing plaintiff's proof, will apply the concept of "substantial assistance" restrictively.

{80}  In sum, to state a cause of action for secondary liability under § 56(c)(1), in addition to proof of a primary liability, a plaintiff must plead that the defendant fits within the category of persons specified in § 56(c)(1). In those actions, the defendant may escape liability through an affirmative defense based on lack of knowledge. To state a cause of action for secondary liability under § 56(c)(2), in addition to proof of primary liability, a plaintiff must plead that the defendant (1) is an employee of the seller or offeror or any other person; (2) materially aided in the transaction; and (3) "actually knew of the existence of the facts by reason of which the liability is alleged to exist." N.C. GEN. STAT. § 78A-56(c) (2013).

3.    Plaintiffs' Claims Against Highwoods and TLG Under the NCSA

    a.    Primary Liability

{81}    The question is presented whether Highwoods became a "seller" by reason of having deeded the fractional interests in the Subject Property directly to Plaintiffs.  The court concludes that this fact is not controlling.  Those cases holding the transferor of a title to real estate to be a seller of a security are distinguishable.

{82}    In *SEC v. W.J. Howey*, *supra*, the defendants were separate corporations under common control and management, one of which owned land on which citrus groves were planted, and the other provided cultivation, development, and marketing services for the groves.  328 U.S. 293, 294–95 (1946).  Together, the two corporations offered investors both a land sales contract offered by the first company and a service contract offered by the second company.  *Id.* at 295.  The Supreme Court did not distinguish between the two companies in finding that the transaction "clearly involve[d] investment contracts" which "[took] the form of land sales contracts, warranty deeds and service contracts which [the two companies] offer[ed] to prospective investors."  *Id.* at 299–300.

{83}    The Ninth Circuit, in *Hocking v. Dubois*, specifically considered the application of the *Howey* standard in a situation where the contract for the sale of the land and the contract for the provision of management services were signed by two distinct entities.  885 F.2d 1449 (9th Cir. 1989).  Significantly, the decision was by the panel *en banc,* and the decision was decided by a 6-5 majority over a strong dissent.  In *Hocking*, the plaintiff Hocking purchased, through defendant real estate broker Dubois, a condominium from two individuals.  *Id.* at 1452.  The issue was whether Dubois was an "offeror" of a security.  Dubois represented to Hocking that "a rental pool arrangement (RPA) would be available to Hocking if he were to purchase the condominium."  *Id.*  After Hocking purchased the condominium he entered into a rental management agreement (RMA) and a RPA with a separate entity, HCP, pursuant to which Hocking gave up control of the condominium except for access to the condominium for a two-week period each year.  *Id.* at 1453.

{84}    Hocking alleged Dubois violated § 12(a)(2) and Rule 10b-5. Dubois countered he did not offer a "security," because, among other reasons, the RMA and RPA were not part of the sale of the condominium and that there was no link between HCP, who entered into the RMA and RPA agreements with Hocking, and Dubois. *Id.* at 1454, 1456. The court disagreed, noting that "[t]he inability of Dubois to make a binding contractual 'offer' of the RPA to Hocking . . . does not mean that the RPA cannot be considered part of the package [Dubois] offered him for purposes of determining whether that package was a security." *Id.* at 1457.

{85}    The Seventh Circuit indicated its disagreement with the Ninth Circuit's approach in *Hocking*. *Allison v. Ticor Title Ins. Co.*, 907 F.2d 645, 649 (7th Cir. 1990) ("We have grave doubts about the correctness of *Hocking* . . . [which] did not satisfactorily address the question how a unit owner who conveys only an interest in real property vends a 'security' just because the proprietor of the condominium development offers a rental pool in which unit owners may participate if they choose").

{86}    North Carolina courts have yet to be confronted with the particular issue presented here. The North Carolina Court of Appeals confronted a related issue in *State v. Williams*, where it held that the defendant attorney could not be held liable as a seller for his participation in the sale of stock certificates in Advantage Corporation. 98 N.C. App. 274, 278, 390 S.E.2d 746, 748 (1990). The attorney prepared the Articles of Incorporation for Advantage, was an officer and investor in Advantage, was present when a sales pitch regarding the stock was made, was present when plaintiff paid for his stock, and signed the sold stock certificates over to the plaintiff as an officer of Advantage. The Court of Appeals held that the attorney's actions did not make him a seller under § 78A-2(8) "because there was neither evidence at trial that he was the owner of the security, nor that he was the one who 'successfully solicit[ed] the purchase . . . .'" *Id.* at 279, 390 S.E.2d at 749 (quoting *Pinter v. Dahl*, 486 U.S. 622, 646 (1988) for the standard used by federal courts to determine who may be held liable as a seller under § 12(1) of the Securities Act of 1933)).

{87}   Here, neither Highwoods nor TLG are alleged to have solicited the investor Plaintiffs in order to sell them a security.  They are not alleged to have promoted the management of the property by Triple Net, either alone or alongside Triple Net.  Plaintiffs stress that Highwoods and TLG were aware that Triple Net was preparing the syndicated transaction and, therefore, must be assumed to have known that a security was being sold.  They contend that Highwoods is a seller of a security as a result of Highwoods' deeding of the property directly to the Plaintiffs.  *See Pinter v. Dahl*, 486 U.S. 622, 642 (1988) ("it is settled that § 12(1) imposes liability on the owner who passed title, or other interest in the security, to the buyer for value.")  While this privity between Highwoods and Plaintiffs as for the transfer of the real estate interests contrasts with the facts in *Howey* and *Hocking*, the court does not believe this fact alone makes Highwoods a seller of the securities.  The critical fact is not Highwoods' transferring the fractional real estate interests to Plaintiffs, but instead is Plaintiffs' entrusting those fractional interests to Triple Net in exchange for investment returns.  Those investment considerations would have been the same whether Triple Net had taken title from Highwoods and then transferred fractional interests, or rather had Highwoods deeded the fractional interests to Plaintiffs directly.  The court concludes that Defendants' involvement in the transaction closely parallels that of the attorney in *Williams* who was held not to be a seller.

{88}   In sum, the court concludes that Plaintiffs have not stated a claim of primary liability against Defendants under the NCSA.  However, as noted earlier, the court has assumed for purposes of the present motion that Plaintiffs have stated a claim of primary liability against Triple Net, which then leads the court to its consideration of whether Plaintiffs have stated a claim of secondary liability against Defendants under the NCSA.

b.   Claims of Secondary Liability

i.   Section 56(c)(1)

{89}   Defendants do not fall into any of the categories of persons enumerated in § 56(c)(1).  There is no allegation that any Defendant controlled Triple Net, was a partner, officer, or director of Triple Net, or can be considered a dealer or salesman.  Accordingly, secondary liability against these Defendants, if any, must arise under § 56(c)(2).

ii.   Section 56(c)(2)

{90}   None of the Defendants is an employee of Triple Net.  The question is then whether Plaintiffs have adequately pled that Defendants are any "other person who materially aid[ed] in the transaction," and who "actually knew of the existence of the facts by reason of which the liability is alleged to exist."  N.C. GEN. STAT. § 78A-56(c)(2) (2013).  Again assuming that Plaintiffs will be able to sustain their burden with regard to a primary liability claim against Triple Net, the court concludes that Plaintiffs, given the benefit of inferences, have made adequate factual allegations of Defendants' secondary liability under the NCSA to withstand Rule 12(b)(6).  The adequacy of actual evidence as to whether Defendants materially aided the transaction and actually knew of the necessary facts must await further proceedings.

{91}   Whether a person's participation in the sale of a security constitutes "material aid" and whether that person "actually knew of the existence of the facts by reason of which the liability is alleged to exist" are necessarily fact-intensive inquiries.  Plaintiffs allege that Defendants knew that PRMO planned to relocate and decided to sell the Subject Property before that information became public and adversely affected the value of the Subject Property (Compl. ¶¶ 62–63), and chose Triple Net as the purchaser knowing it would be marketing the Subject Property as securitized TIC interests (Compl. ¶ 90).  The inference is that the Subject Property would have supported Triple Net's transaction only if the property value did not

decline because of concerns that PRMO would not renew its lease. Plaintiffs further allege that Defendants provided Triple Net with information relating to the Subject Property and PRMO's long-term planning while knowing, but not disclosing, that they were affirmatively aware of and assisting PRMO in plans to vacate the Subject Property. Plaintiffs contend that Defendants thereby "participated in the dissemination of false information in connection with the offering and sale of the Subject Property . . . ." (Compl. ¶ 251.) Plaintiffs' claim does not rest entirely on allegations as to the COM, and the court does not here hold that the COM itself "materially aided" the transaction. Defendants contend that these facts are not adequate to state a claim where the PPM clearly reflects that Triple Net relied on its own due diligence and Plaintiffs affirmatively represented, by accepting these terms, that they relied exclusively on Triple Net.

{92}    As to Plaintiffs' § 56(c)(2) claims only, Defendants' Motions are DENIED. Otherwise, Plaintiffs' claims under the NCSA are DISMISSED. The court will revisit this holding as necessary should it conclude that Plaintiffs have, in fact, been unable to sustain their burden in regard to a claim of primary liability against Triple Net under the NCSA.

B.    Claims Based on Fraud, Fraud in the Inducement, and Negligent Misrepresentation

{93}    The court concludes that Plaintiffs have not stated a claim for common law fraud, fraud in the inducement, or negligent misrepresentation because they have not adequately alleged justifiable reliance, which is an element for each of these claims. The alleged facts, even with inferences in Plaintiffs' favor, do not adequately demonstrate such reliance.[3]

{94}    At best, only four of the Plaintiffs allege they ever received or saw the COM or received oral communications from Defendants' representatives. The other Plaintiffs could not have justifiably relied on the COM which they never saw.

---

[3] This lack of reliance would also be another basis for holding that Plaintiffs have not stated a claim under NCSA § 56(a)(1).

*Hernandez v. Coldwell Banker Sea Coast Realty*, 735 S.E.2d 605, 605 (N.C. Ct. App. 2012). The court rejects Plaintiffs' effort to rely on a doctrine of indirect reliance, that is, by claiming that they can demonstrate reliance by proving that Triple Net relied on statements or omissions by Defendants, or that somehow the Subject Property would never have been sold "but for" Defendants' suppression of the true facts regarding PRMO's planning for a potential relocation. Even assuming, as Plaintiffs contend, that Triple Net's PPM is based on or incorporated information from Defendants' COM, and ignoring that Triple Net modified the probabilities stated in the COM and directed Plaintiffs to rely solely on Triple Net's own due diligence, Plaintiffs cannot transfer Triple Net's reliance on the COM to their reliance on the PPM. *See Raritan River Steel Co. v. Cherry, Bekaert & Holland, Gen. P'ship*, 322 N.C. 200, 205–07 (1988) (Plaintiffs alleged the report they relied upon specifically incorporated information from defendant auditor's report, but did not allege that they ever saw the auditor's report. The North Carolina Supreme Court held that the plaintiffs' allegation that they relied upon a document other than defendant's report necessarily defeated their claim for negligent misrepresentation), later proceeding at 329 N.C. 646 (1991).

{95}    Plaintiffs' reliance on *Rowan County Board of Education v. U.S. Gypsum Co.* is misplaced. 103 N.C. App. 288, 407 S.E.2d 860 (1991); (Pls.' Resp. to Defs.' Mot. to Dismiss 6–9; Resp. Br. in Opp'n to the Mot. to Dismiss By Def. Thomas Linderman 10–13.) The information published by the defendant in *Rowan* was republished verbatim by a catalog which had no duty to investigate, whereas here the information published by Defendants was provided to Triple Net for the purpose of facilitating Triple Net's own due diligence, and Triple Net independently published the PPM on which Plaintiffs relied. *Rowan*, 103 N.C. App. at 297–98, 407 S.E.2d at 865; *see also Hospira Inc. v. AlphaGary Corp.*, 194 N.C. App. 695, 700–01, 671 S.E.2d 7, 12 (2009). Further, in *Rowan*, the misleading information was presented directly to the plaintiff's agent and relied upon by the agent. *Id.* at 16–22, 418 S.E.2d at 658–661; *Hospira Inc.*, 194 N.C. App. at 699–700, 671 S.E.2d at 11.

{96} The four Plaintiffs that allegedly received the COM at some point fare no better. They could not under the circumstances have justifiably relied on the COM. *See Ballance v. Rinehart*, 105 N.C. App. 203, 412 S.E.2d 106 (1992); *Williams v. United Cmty. Bank*, 724 S.E.2d 543, 550 (N.C. Ct. App. 2012). Like Plaintiffs' allegations in the present suit, the plaintiff purchaser of real estate in *Ballance* alleged that defendant, who prepared a real estate appraisal for a third party bank, "knew or should have known at the time that he rendered the appraisal report that, although the appraisal report was prepared for [third party bank], other persons, particularly potential home buyers, would rely on the report as verification of the condition and value of the property." 105 N.C. App. at 204, 412 S.E.2d at 107. The Court of Appeals noted that the North Carolina Supreme Court in *Raritan* adopted the Restatement (Second) of Torts § 552, which limits the liability of a supplier of information to those "persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it." *Id.* at 206–08, 412 S.E.2d at 108 (*quoting* RESTATEMENT (SECOND) OF TORTS § 552 (1977). Applying this standard, the Court of Appeals affirmed the trial court's grant of defendant's motion to dismiss finding that plaintiff "failed to sufficiently allege that she is a person for whose benefit and guidance defendant *intended* to supply the appraisal report, or that defendant *knew* that the recipients of the report, [third party bank], intended to supply it to plaintiff." *Ballance*, 105 N.C. App. at 208, 412 S.E.2d at 109.

{97} Plaintiffs here allege that Defendants "knew or should have known that the false statements and material omissions contained in the [COM] were being republished in other materials relied on by Plaintiffs" because they were aware of the nature of the TIC transaction and that Triple Net was republishing information from the COM in its PPM. (Compl. ¶ 85.) There is no evidence that Defendants, at the time the COM was released, anticipated or intended that the Subject Property would be divided into fractional shares and resold as securitized TIC interests. Rather the COM was intended to solicit interest from a purchaser that would then negotiate a final purchase contract. Defendants issued the COM

well before they knew that Triple Net would purchase the property or that Triple Net would sponsor a syndication. The COM also specifically states that it is being provided only to potential purchasers of "the interest described herein," which is purchase of the Subject Property, and that it may not be reproduced and shall be held in the "strictest confidence." (Compl. Ex. E.)

{98}    As noted previously, there is no general duty to speak in the context of a commercial real estate transaction and the NCSA does not otherwise provide for such a general duty. To the extent that Plaintiffs want to incorporate Triple Net's reliance on Defendants, they must be constrained by the general rule of no duty to speak and by the established rule that when "the purchaser has full opportunity to make pertinent inquiries but fails to do so through no artifice or inducement of the seller, an action in fraud will not lie." *C.F.R. Foods, Inc.*, 107 N.C. App. at 589, 421 S.E.2d at 389 (quoting *Libby Hill Seafood Rests., Inc. v. Owens*, 62 N.C. App. 695, 698, 303 S.E.2d 565, 568 (1983)).[4]

{99}    Defendants' Motions are GRANTED as to Plaintiffs' claims for fraud, fraud in the inducement, and negligent misrepresentation.


C.    Claims Under the UDTPA

{100}   Plaintiffs pled claims under the UDTPA and the NCSA in the alternative, as claims governed by the NCSA fall outside the scope of the UDTPA. *Latigo Invs. II, LLC v. Waddell & Reed Fin., Inc.*, 2007 NCBC LEXIS 17, at *37 (N.C. Super. Ct. June 11, 2007) (citing *Skinner v. E. F. Hutton & Co., Inc.*, 314 N.C. 267, 333 S.E.2d 236 (1985)). The UDTPA may allow a claim based on unfair or deceptive practices, including representations or omissions, and such claims under appropriate circumstances can proceed even without proof of fraud. However, such actions do require a plaintiff to prove reliance and proximate cause. "Where an unfair or deceptive practice claim is based upon an alleged misrepresentation by the

---

[4]  The court acknowledges Defendants' contentions that even if Plaintiffs could be said to have justifiably relied on the COM, none of the alleged misstatements in the COM are actionable. (Highwoods Defs.' Br. in Supp. 12; TLG Br. in Supp. 17 n.12.) The court need not reach this argument in light of its finding that Plaintiffs could not have justifiably relied on the COM.

defendant, the plaintiff must show actual reliance on the alleged misrepresentation in order to establish" proximate causation. *United Cmty. Bank*, 724 S.E.2d at 549.[5]

{101} Plaintiffs' claims for violations of the UDTPA are DISMISSED.

D.      Claims of Civil Conspiracy

{102} Plaintiffs allege that Defendants "combined, conspired, and agreed together to make misrepresentations of material facts and concealed [sic] material facts" and thereby "committed fraud, fraud in the inducement, negligent misrepresentation, and violated Chapter 78A and Chapter 75 of the North Carolina General Statutes." (Compl. ¶¶ 264–65.) There is no separate cause of action for civil conspiracy; the claim is instead premised on the underlying act. *Strickland v. Hedrick*, 194 N.C. App. 1, 19, 669 S.E.2d 61, 72–73 (2008). If the underlying acts supporting a claim for conspiracy are dismissed, so too must the claim for conspiracy be dismissed. *Esposito v. Talbert & Bright, Inc.*, 181 N.C. App. 742, 747, 641 S.E.2d 695, 698 (2007). Here, a conspiracy claim can then survive only as to the secondary liability claim under the NCSA if it survives at all. Ultimately, that claim may be the simple equivalent of secondary liability for having materially aided the securities transaction with actual knowledge of the operative facts. The court will allow the conspiracy claim to survive the Rule 12(b)(6) motion subject to its later consideration of whether the claim should ultimately be allowed to continue in addition to the underlying NCSA claim. However, the court at this time believes that even if the claim survives, it should be subject to the same limited recoveries as provided by the NCSA.

{103} Claims for conspiracy related to claims of fraud, fraud in the inducement, and negligent misrepresentation are DISMISSED.

---

[5] The court acknowledges that in an appropriate case, a court will need to examine whether a *sui generis* claim under the UDTPA may proceed because Defendants' conduct was "unfair" even if it were not deceptive, and, if so, what standard regulates what is actionable unfairness. *See* Matthew W. Sawchak & Kip D. Nelson, *Defining Unfairness in "Unfair Trade Practices*, 90 N.C. L. REV. 2033, 2050–56 (2012). However, the court does not believe this to be the case for that analysis.

E.       Punitive Damages Claims

{104} The court concludes that the dismissal of other claims leads to a conclusion that the claims for punitive damages should also fail.  Accordingly, the claims for punitive damages are DISMISSED.

## VII.   CONCLUSION

{105} For the foregoing reasons, Defendants' Motions are GRANTED as to Plaintiffs' First (Fraud), Second (Fraud in the Inducement), Fourth (Unfair and Deceptive Trade Practices), and Fifth (Negligent Misrepresentation) causes of action and as to Plaintiffs' claim for punitive damages, and DENIED as to Plaintiffs' Third (Chapter 78A) and Sixth (Conspiracy) causes of action, except that the Sixth Claim shall be limited to a claim of conspiracy to violate the NCSA.

IT IS SO ORDERED, this the 19th day of February, 2013.